**EXHIBIT A**

MAX WARREN BARBER
4645 S. Highland Drive.
Holladay, Utah 84117
Email: 23blackbee@gmail.com
Plaintiff, pro se

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| MAX WARREN BARBER, an individual,<br>Plaintiff,<br><br>**v.**<br><br>DAVID LEE KNUDSON, an individual; JAMIS M. JOHNSON, an individual; Adrian Isaac Johnson, an individual; DASTAN M. D'IO (a/k/a Dallin Mark Durbano), an individual; STEPHANIE STRASNICK, an individual; JARED ANDERSON, an individual; ANDERSON, FIFE, MARSHALL & JOHNSON, LC, a Utah law company; PACE WILLIAM JOHNSON, an individual; KARAN SALAS, an individual; STACY ROBERTS JOHNSON, an individual; JEREMY SHORTS, an individual; DAVID GARDNER, an individual; STEVEN R. SKIRVIN, an individual; KENYON D. DOVE, an individual; SMITH KNOWLES PC, a Utah law firm; GRAVITY SEGREGATION LLC (d/b/a Gravity Capital, LLC), a Utah LLC; 1028 S. 1900 E. LLC, a Utah LLC; DAVID ALBERT LILLYWHITE, an individual; JOSHUA DAVID LILLYWHITE, an individual; SUMMIT OPERATING LLC, a Utah LLC; PACE JOHNSON LAW GROUP LLC, a Utah LLC,<br>Defendants. | **SECOND AMENDED COMPLAINT**<br>**JURY TRIAL DEMANDED**<br><br>**Case No. 2:25-cv-00681-HCN-DBP**<br><br>District Judge: Howard C. Nielson, Jr.<br>Magistrate Judge: Dustin B. Pead |

Plaintiff Max Warren Barber, *pro se,* files this Second Amended Complaint against Defendants for damages and other relief under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968; the Truth in Lending Act, 15 U.S.C. § 1601 et seq.; the Home Ownership and Equity Protection Act, 15 U.S.C. § 1639 et seq.; the Sherman Act, 15 U.S.C. § 1; the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.; the Bankruptcy Code, 11 U.S.C. § 362; and Utah state law.

## I. PRELIMINARY STATEMENT

This case concerns a July 22, 2025 foreclosure sale conducted during an automatic stay and in breach of a court-approved stipulation whose conditions the creditor had not performed. The underlying loan advanced $332,000, but the lender recorded a $2,400,000 lien against two residential properties valued at a combined $2,900,000. The stipulation required the lender to correct the lien and produce a good-faith accounting before any sale. Neither was completed. The trustee published the Notice of Sale before the lien was corrected. The Stipulation conditioned the fourteen-day stay waiver on that correction; the lien was never corrected and the waiver was never triggered. Gravity set the opening credit bid at $650,000, below every claimed debt figure it had represented. A single insider bidder, whose family's relationship with Gravity's president spans four decades and who communicated with him before the sale, acquired both homes at an auction no outside bidder attended, for $79,928.26 less than the claimed debt figure Gravity had represented. Barber had contracted to sell the properties for $2,900,000.

## II.
## PARTIES

1. **Plaintiff Max Warren Barber** ("Barber") is a citizen of Utah residing in Salt Lake County.

### Defendants

2. **Defendant David Lee Knudson** ("Knudson") is a citizen of Utah. He is president of Gravity Segregation LLC (d/b/a Gravity Capital, LLC), originated the Loan, and is permanently enjoined by a 1999 FTC order prohibiting the lending practices alleged in this action.

3. **Defendant Jamis Melwood Johnson** ("Jamis") is an individual residing in and a citizen of the State of Utah. Johnson is a disbarred attorney (*In re Discipline of Johnson*, 2001 UT 110, 48 P.3d 881). He directed his son Adrian to Knudson before the foreclosure sale and is in possession of the 1028 Property.

4. **Defendant Adrian Isaac Johnson** ("Adrian") is a citizen of Utah and the son of Jamis Melwood Johnson. He was the sole insider bidder at the July 22, 2025 foreclosure sale and took title to the Yale Property.

5. **Defendant Dastan M. D'io** ("Dio") (a/k/a Dallin Mark Durbano) (Utah Bar No. 17201) is a citizen of Utah. He appeared as Of Counsel at Pace Johnson Law Group LLC in the eviction action and drafted an expanded court order inserting findings, including a finding of "federal crime," beyond the jurisdiction of an unlawful-detainer court and its findings.

6. **Defendant Stephanie Strasnick** (AKA Stephanie Strasnick Johnson) is a citizen of Utah and the wife of Adrian Isaac Johnson and took title to the Yale Property.

7. **Defendant Jared L. Anderson** ("Anderson") (Utah Bar No. 8140) is a citizen of Utah. He acted as substitute trustee on the Deed of Trust and conducted the July 22, 2025 foreclosure after receiving written notice of the automatic stay and executed both Trustee's deeds.

8. **Defendant Anderson, Fife, Marshall & Johnson, LC** ("Anderson's firm") is a Utah law company in Provo, Utah, employing Anderson.

9. **Defendant Steven R. Skirvin** ("Skirvin") is a citizen of Utah. He practices through Skirvin Law PLLC, litigation counsel for the Gravity entities. He also held operational roles for Gravity signing Substitution of Trustee as Vice President and signed corporate filings as Authorized signer and Authorized person. On the eve of the foreclosure sale, Skirvin directed the trustee to "please proceed with the sale tomorrow" and ordered that "any discussion on numbers should wait until after the sale."

10. **Defendant Kenyon D. Dove** ("Dove") (Utah Bar No. 9868) is a citizen of Utah. He represented Gravity in Plaintiff's bankruptcy proceeding, drafted the Stipulation conditioning the In Rem relief on lien correction and a good-faith accounting. Dove cleared the July 22nd, 2025 foreclosure sale four minutes after receiving written stay notice without disclosing that neither condition had been performed.

11. **Defendant Smith Knowles PC** is a Utah law firm employing Dove.

12. **Defendant Jeremy Shorts** is a citizen of Utah who served as counsel for 1028 S. 1900 E. LLC in the eviction action (No. 250906343). He filed on the void Trustee's Deed without disclosing the active bankruptcy stay.

13. **Defendant David Gardner** is a citizen of Utah who served as co-counsel for 1028 S. 1900 E. LLC in the same eviction action.

14. **Defendant Pace William Johnson** ("Pace") is a citizen of Utah and a licensed attorney. The son of Jamis M. Johnson and brother of Adrian Isaac Johnson. He is the sole member of 1028 S. 1900 E. LLC who took the title of the 1028 South 1900 E Property and is the owner of Pace Johnson Law Group LLC. The Clerk entered default (ECF No. 203).

15. **Defendant Karan Salas** is a citizen of Utah and the wife of Jamis M. Johnson. She is in possession of the 1028 South 1900 East Property. The Clerk entered default (ECF No. 203).

16. **Defendant Stacy Roberts Johnson** is a citizen of Utah and the spouse of Pace William Johnson. Pace Johnson has declared that he and the 1028 S. 1900 E. LLC are interchangeable. The Clerk entered default (ECF No. 203).

17. **Defendant David Albert Lillywhite** is a citizen of Utah. He is a Governing Person of Summit Operating LLC, which held both manager Positions at Gravity Segregation, and of Weighting Agent Management LLC, which served as Gravity's Registered Agent. SEC filings identify him as a Director of Gravity Segregation LLC.

18. **Defendant Joshua David Lillywhite** is a citizen of Utah, the son of David Albert Lillywhite. He is Gravity Capital's Senior Loan Officer, responsible for generating and evaluating lending opportunities.

19. **Defendant Gravity Segregation LLC** (d/b/a Gravity Capital, LLC) ("Gravity") is a Utah LLC, the lender on the Loan. Every act pleaded in this Complaint as an act of "Gravity Capital" is an act of Gravity Segregation LLC (Ex. 1)

20. **Defendant 1028 S. 1900 E. LLC** ("1028 LLC") is a Utah LLC that took title to the 1028 Property. Pace Johnson is its sole member and PJLG is its Registered Agent.

21. **Defendant Summit Operating LLC** is a Utah LLC in the Summit network, controlled by David Lillywhite, and acted as manager of Gravity Segregation LLC.

22. **Defendant Pace Johnson Law Group LLC** ("PJLG") is a Utah LLC whose applicant and owner is Pace Johnson. PJLG prosecuted the eviction action (No. 250906343).

**The Properties**

23. The Properties at issue are:

a. 1028 South 1900 East, Salt Lake City, Utah (Parcel 16-09-427-010-0000), Barber's primary residence ("the 1028 Property"); and

b. 1836 East Yale Avenue, Salt Lake City, Utah (Parcel 16-09-429-005-0000) ("the Yale Property").

24. Both properties sit in the Harvard-Yale neighborhood of Salt Lake City. Their combined value is $2,900,000.

## III.
## JURISDICTION AND VENUE

25. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968; the Truth in Lending Act, 15 U.S.C. § 1601 et seq.; the Home Ownership and Equity Protection Act, 15 U.S.C. § 1639 et seq.; the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.; the Sherman Act, 15 U.S.C. § 1; and the Bankruptcy Code, 11 U.S.C. § 362. Supplemental jurisdiction lies under 28 U.S.C. § 1367.

26. The Court has jurisdiction under 28 U.S.C. § 1334 over claims arising under, arising in, or related to the bankruptcy proceedings, including the automatic stay, the Stipulation, the Conditional In Rem Order, and defendants' use of bankruptcy-court process to obtain foreclosure authority.

27. Venue is proper under 28 U.S.C. § 1391(b). The Properties are situated in this District. Civil RICO venue and nationwide service are proper under 18 U.S.C. § 1965.

## IV.
## STANDING

28. Barber personally guaranteed the loan, which was secured by both Properties (¶ 23). He occupied the 1028 Property, maintained possession of the Yale Property, and was dispossessed of both after the July 22, 2025 sale. His equity loss exceeds $2,000,000. The loan instruments bind Barber individually through four interlocking definitions:

a. The Note identifies "Borrower" as "Max W. Barber and Sara G. Navarra,

Trustees of the MSB Trust" and references "a loan guaranty signed by Max W. Barber" (ECF No. 35-9 at PageID.534). Barber signed as Trustee (PageID.536).

b. The Business Loan Agreement defines "Borrower" (the Trust) and "Max W. Barber (each a 'Guarantor' and together with the Borrowers, the 'Obligors'), jointly and severally" (ECF No. 35-9 at PageID.537). Every BLA obligation running against "Obligors" binds Barber individually. Barber signed as Trustee and as individual Guarantor (PageID.553).

c. The Loan Guaranty identifies Barber as "an individual" with his "home address," guarantees "absolute" payment and "primary" liability, and provides that "Lender may proceed against Guarantor without having commenced any action against ... Borrower" (ECF No. 35-9 at PageID.554-555). Barber signed the loan guaranty as an individual. (id. at PageID. 555)

d. The Deed of Trust ( “DOT”) defines "Loan Documents" to include documents executed by "guarantors". The Guaranty is therefore a Loan Document (DOT § 1.4, ECF No. 35-9 at PageID.557)

29. Under the court-approved Stipulation entered in the First Petition (the "Stipulation"), Barber signed "as Trustee and Individually" and is identified as "Co-Debtor" (Ex.2; ECF No. 116-2 at PageID.1981 (Ex. B). The Addendum defines "the Debtor identified herein" as "Max W. Barber and the MSB Trust" (id., Addendum ¶ 2, at PageID.1986).

30. Barber occupied the 1028 Property as his residence and was in possession on July 22, 2025. He was dispossessed after the sale.

31. The DOT was recorded against both Properties (Entry 13917256) and has never been reconveyed. MSB Trust's interest as trustor under the DOT is property of the estate under 11 U.S.C. § 541(a)(1).

32. To the extent any claim requires trust, beneficiary, or successor-trustee capacity, Barber holds those capacities as sole trustee and sole beneficiary of MSB Trust (ECF No. 178-2 at PageID.2803; ¶ 29). Individual standing exists independently (¶¶ 28-31); alternative capacities are pleaded under Rule 17(a).

33. By Warranty Deed dated March 28, 2025, recorded July 21, 2025 as Entry No. 14412278 (Book 11587, Page 4349), GSE Global LLC conveyed the 1028 Property and the Yale Property, to Max W. Barber, Trustee of the MSB Trust dated December 12, 2017. The recorded chain: MSB Trust (Entry 12679838, Dec. 2017) to GSE Global LLC (Entry 14020563, Sept. 2022) to Barber, Trustee of MSB Trust (Entry 14412278, July 2025).

## V.
## FACTUAL ALLEGATIONS

34. Barber incorporates all preceding allegations. To the extent any allegation concerns events after the First Amended Complaint ("FAC"), Barber pleads those facts under Fed. R. Civ. P. 15(d).

35. Where transmission details lie in Defendants' exclusive control, Plaintiff pleads the known external facts and the remainder on information and belief, to be particularized after discovery.

**The Loan and the Inflated Lien (March 22-23, 2022).**

36. On March 22, 2022, Gravity Capital originated a loan (the "Loan") documented by four instruments: a Promissory Note (the "Note"), a Business Loan Agreement (the "BLA"), a Loan Guaranty (the "Guaranty"), and a Deed of Trust (the "DOT") (ECF No. 35-9 (Ex. J)). Terms: $1,200,000 maximum principal, $332,000 initial advance, 92-day balloon (maturity June 22, 2022), 15% base rate, 24% default rate compounding monthly, a late charge of ten percent of the delinquent payment, and on each annual anniversary after maturity an additional late charge of ten percent of the full outstanding balance (Note §§ 4-5, at PageID.534-535), secured by two residential properties (DOT § 1.7, at PageID.556-565).

37. **The Inflated Lien.** On March 23, 2022, the lender recorded the DOT under Entry No. 13917256 against both parcels (ECF No. 35-9 at PageID.556-565 (Ex. J)). Each parcel reflects the $1,200,000 lien, a combined $2,400,000 encumbrance on a $332,000 advance (ECF No. 35-3 at PageID.266-274 (Ex. D)), 7.23 times the amount advanced. The BLA's 55% LTV covenant (BLA § 1.8(d)(6), at PageID.539) confirms the $1,200,000 was the credit ceiling, not the anticipated debt.

38. The DOT recites a fixed "stated principal amount of $1,200,000.00" that is "evidenced by the Note" (DOT §§ 1.3, 1.5, at PageID.557). The Note evidences no such sum: it labels $1,200,000 the "Maximum Principal Amount" and $332,000 the "Initial Advance Amount" (Note §§ 1-2, at PageID.534). The Note is open-end: Barber owes "so much as is advanced" (Note §§ 1-2). The BLA confirms the $1,200,000 is "reference and maximum Lender potential lending capacity only" (BLA § 1.8(a), at PageID.538).

39. The Note was never attached to the recorded DOT. The public record showed a $1,200,000 lien "evidenced by" a document that evidenced only a $332,000 advance beneath a ceiling.

40. Knudson declared under oath: "Plaintiff's only draw of principal in his loan, due to his default, was the initial principal draw of $332,000.00" (Knudson Decl., ECF No. 67 at PageID.1139 ¶ 5).

41. On June 17, 2025, Knudson executed and recorded a Scrivener's Affidavit reciting that "the initial principal draw of this Loan is $332,000.00" and stating "[t]his was not a drafting error or mistake. The Deed of Trust properly secures the line of credit up to the stated maximum" (ECF No. 71-10 at PageID.1328 (Ex. 8)). The $2,400,000 encumbrance was left uncorrected.

**The Business-Loan Mischaracterization (March 22, 2022).**

42. The lender-drafted documents labeled the Loan "business purpose" in three separate provisions: the Note's signature-block recital that the loan "will be used solely for business, commercial and/or investment purposes and not for personal, family or household purposes" (ECF No. 35-9 at PageID.536), BLA § 1.8(a)'s statement that the loan is "for the purpose of funding Borrower's ongoing business activities in constructing and selling wellhead equipment" (PageID.538), and BLA § 2.11's representation that the loan is "solely and exclusively for business and commercial purposes" (PageID.542). Barber has never operated a wellhead equipment business. The following documents contradict the business label:[1]

[1] Whether credit is "primarily for a business, commercial, or agricultural purpose" under 12 C.F.R. § 1026.3(a)(1) is determined by a multifactor analysis: (1) the relationship of the borrower's primary occupation to the acquisition; (2) the degree to which the borrower will personally manage the acquisition; (3) the ratio of income from the acquisition to total income;

a. Within the same agreement, BLA § 2.11 states that "Borrower will use the loan proceeds solely in connection with the improvement and development of the Property" (ECF No. 35-9 at PageID.542), and BLA § 2.18 labels the Loan "a temporary bridge loan" that "is not intended as long-term or permanent financing" (ECF No. 35-9 at PageID.543).

b. Barber informed the originating broker, Gene Parrish, in writing on March 21, 2022 that he lived at the 1028 Property (Ex. 3; ECF No. 36-1 at PageID.609). Parrish requested residential homeowner's insurance for "both homes" and had Gravity added as "Additional Insured."

c. The Guaranty identifies Barber by his "home address" at 1028 South 1900 East, his Social Security number, and his date of birth, the same address as the secured property (Ex. 3; ECF No. 35-9 at PageID.554)

d. The Certification of Trust, recorded with the DOT (Entry 13917256), identifies the trust's tax number as Barber's Social Security number (Certification ¶ 4), states the trust is revocable (¶ 1), and lists the trustees' address as 1028 South 1900 East (¶ 2), the secured property. The trust holds no Employer Identification Number. ( ECF No. 88-8 at PageID.1627-1629)

e. The loan was secured by both of Barber's residential properties, 1028 South 1900 East, where he and his family lived, and the Yale Property, which he disclosed was being renovated for the same residential use (Ex. 3).

---

(4) the size of the transaction; and (5) the borrower's statement of purpose. Official Staff Commentary, 12 C.F.R. Part 1026, Supp. I, Comment 3(a)-3. A borrower's signed statement of business purpose is only one factor and is not dispositive.

f. Trustee sale notices were mailed to Barber at the 1028 Property, his residence (ECF No. 88 at PageID.1549 ¶ 13).

g. Gravity moved for, stipulated to, and obtained relief from the co-debtor stay under 11 U.S.C. § 1301, naming Barber as "Co-Debtor" ( ¶¶ 29, 61).

**Consumer-Lending Violations (March 22, 2022).**

43. No consumer-lending disclosures were provided at origination: no disclosure statement, APR disclosure, finance charge disclosure, payment schedule, and right-to-rescind notice as required by 15 U.S.C. § 1635(a). No high-cost mortgage disclosures were furnished three business days before consummation, and no rescission notice was provided to either consumer entitled to rescind. The business-purpose label (¶ 42) eliminated Barber's right to rescind the dwelling-secured transaction entirely.

44. The CFPB rate-spread calculator (ffiec.cfpb.gov/tools/rate-spread) returns a rate spread of 11.670 percentage points for a fixed-rate loan originated March 22, 2022 at a 15.000% APR; the corresponding average prime offer rate is 3.330% (1-year fixed APOR for the effective week of March 21, 2022).

45. The BLA imposed $16,800 in origination charges denominated "Discount Points" and a $1,000 "Inspection Fee," both "fully earned and not subject to a refund" (BLA § 1.6, ECF No. 35-9 at PageID.537), and additional "Lender's Costs" deducted from the loan proceeds (BLA § 1.7, at PageID.537-538). The $17,800 in named fees is 5.36% of the $332,000 advanced.

46. The Note recites prepayment "without penalty" while providing that the discount points and inspection fee are "earned fully as of the date assessed... and will not be refunded or credited upon early payment" (Note § 3, ECF No. 35-9 at PageID.534), a forfeiture of prepaid charges on early payoff.

47. The BLA labels the loan "a temporary bridge loan" that "is not intended as long-term or permanent financing" (BLA § 2.18, ECF No. 35-9 at PageID.543). Barber owned and occupied both Properties before the loan (¶¶ 23, 42(b)-(e)), and the loan financed neither acquisition nor construction. No restitution or beneficial adjustment was undertaken within thirty days of consummation.

48. No performance bond was obtained before the Loan.

**Gravity's Lending Model and the 1999 FTC Permanent Injunction.**

49. In 1999, this District permanently enjoined David Knudson in *FTC v. Wasatch Credit Corp.*, No. 2:99-cv-0579 (the "1999 Order"). The Order has no expiration and binds Knudson "whether acting directly or through any business, entity, corporation, subsidiary, division or other device."(ECF No. 35-7 at PageID.501-522 (Ex. H))

50. The Order prohibits the following, each of which the Loan repeats:

a. Directing a consumer to state a false business purpose (§ III.C). The lender drafted the business-purpose label despite Barber's written disclosure that he lived at the secured property and was renovating the second for residential use (¶ 42(b), (e)).

b. Misrepresenting any credit cost or term, including whether the credit is open-end (§§ III.A.1, III.A.5). The DOT recorded a fixed "stated principal amount of

$1,200,000.00" on what the Note and BLA define as an open-end line of credit with a $332,000 initial advance (¶¶ 38, 40). The Note recites prepayment "without penalty" while forfeiting $17,800 in charges on early payoff (¶ 46).

c. Falsifying or altering material information in any document relating to a credit transaction, "including but not limited to information concerning the purpose of the extension of credit" (§ III.D). The BLA states the Loan is for "constructing and selling wellhead equipment" (¶ 42); Barber has never operated a wellhead equipment business. The Scrivener's Affidavit preserved the inflated lien as correct (¶¶ 37-38, 41).

d. Extending dwelling-secured high-cost credit with a balloon maturity or compounding default rate (§§ I.F, I.G). The Loan carried both (¶ 36).

e. Collateral-only lending without regard to ability to repay (§ I.H). The BLA's 55% LTV covenant confirms the Loan was asset-based (¶ 37).

f. Extending dwelling-secured consumer credit without preserving the borrower's right to rescind (§§ II.L-M). The business-purpose label eliminated that right entirely (¶ 43).

g. Offering or extending consumer credit without first obtaining a $250,000 performance bond (§ IV). No bond was obtained (¶ 48).

51. Prohibitions (a), (b), and (c) fall under Section III of the Order, which applies to all credit, not solely consumer credit.

52. Gravity's own FAQ (Ex. 4) describes its lending model: "no credit criteria," lending "up to half of what we think the property is worth" to borrowers who "have either low credit scores, do not have proof of income, have gone bankrupt, have no tax returns, and some have been to jail," at 12% to 18% interest, in "all 50 states." Gravity states it is "in the business of making business loans" and that "[w]e secure these loans against real estate." Gravity does not lend on "owner-occupied residential consumer loans" — yet it secured the Barber Loan against two owner-occupied residential properties (¶ 42(b)-(e))

53. In a 2020 investor-training video (ECF No. 129-3 (Ex. C)), Knudson stated Gravity targets "the non-bankable" (at 3:05): "why would I lend money to a guy that's not bankable? One is because he had collateral" (at 3:16). Knudson stated that "half our borrowers struggle a little bit to make payments on time" (at 4:44), that "we've geared our scenario to people who don't make their payments on time" (at 4:52), with a "rollover fee ... built into the documents" (at 5:13), and that Gravity has "done hundreds and hundreds of these loan transactions" (at 5:49). Gravity Segregation's own Articles of Organization define its purpose as "to provide private financing to individuals and possibly to companies" (Ex. 22).[2]

**Barber's 2024 Payoff Requests.**

54. On August 16, 2024, Barber wrote, "Please also send over the payoff amount you forgot to email last time I requested," and Knudson replied "Ok" (ECF No. 36-6 at PageID.660 (Ex. Q)). On September 19, 2024, Barber wrote he had "asked more than a few times now for

---

[2] No claim is asserted under the 1999 Order. These facts are alleged to show motive, knowledge, willfulness, and absence of mistake. *See* Fed. R. Evid. 404(b)(2).

statement / payoff," and Knudson replied "I'll order it" (at PageID.667). No payoff statement was produced.

**The Shifting Payoff Figures (April-July 2025).**

55. Three claimed debt figures were produced in 49 days; no two are reconcilable (Ex. 5; ECF Nos. 35-2, 36-9):

(1) **April 2, 2025**: Knudson issued a Payoff Quote of $622,123.30 to Cottonwood Title, stating it "will accept $622,123.30 to release its lien from the Properties" and "consider the loan paid in full," and that "[t]his amount includes all interest, fees, and legal expenses incurred to date" (Ex. 6).

(2) **April 28:** Skirvin emailed Dove from steve@thesummitcompanies.com a "Total Payoff" of $729,929.26, including "an extra $10k built into legal," crediting $130,663.63 in payments received (ECF No. 70-2 at PageID.1157).

(3) **May 21:** Dove's office emailed a proposed stipulation with $733,000 as the payoff, stating the "terms are only valid up to today's hearing" (ECF No. 36-9 at PageID.765 (Ex. T)).

(4) **May 21, 11:43 AM**: Barber objected: "I am still unsure how Gravity has now amassed over 107K in a day" (ECF No. 36-9 at PageID.765).

(5) **May 21, 12:31 PM**: Dove proposed: "What if we just stipulate to in rem relief today and you agree to dismiss the motion as to my clients and I and we'll agree to schedule the sale sometime after July 7th. That will give you time to sell the property and still leaves the question open to resolve the total amount owed in advance of July 7th"

(id.). At 1:22 PM, Barber signed and returned the updated Stipulation (id. at PageID.766).

(6) **May 21, 3:25 PM**: Dove emailed: "I am concerned about recording an amended deed of trust affecting the priority of my client's lien" and stated he had "requested a current more detailed payoff from my clients" (ECF No. 36-9 at PageID.766).

(7) **May 29:** Barber emailed Dove: " Day of the last hearing we discussed you would go back to your clients to get a clear accounting as how they came to the balance" (ECF No. 36-9 at PageID.767). Dove's office responded May 30: "we will contact Gravity regarding a clear accounting" (id.).

(8) **June 13:** Barber followed up: "the time has passed since we agreed your client would submit the 1.) detailed accounting they have on this file and 2.) the amendment to the Salt Lake County Recorders record on the properties ... to reflect the correct amount (not 1.2M)" (ECF No. 35-2 at PageID.270 (Ex. C)). Dove responded: "My clients are recording a Scrivener's Affidavit with regard to the Deed of Trust clarification needed. We have also requested the payoff statement from them. We'll ask again so that we can forward that to you as soon as possible" (id.).

56. Between April 2 and April 28, 2025, the claimed debt increased from $622,123.30 to $729,929.26 (¶ 55 items 1-2), an increase of $107,805.96 in twenty-six days.

**The Stipulation and the Conditional In Rem Order (May-June 2025).**

57. On May 21, 2025, the parties executed the Stipulation Re: Motion for In Rem Relief in the Chapter 13 proceeding, Case No. 25-21749 (Ex. 2; Doc. 47, ECF No. 116-2 at PageID.1981 (Ex. B)). Dove through Smith and Knowles PC (¶¶ 10-11) proposed and drafted the Stipulation on Gravity's behalf. The Stipulation identifies "Debtor" as "Max Warren Barber as Trustee of the MSB Trust dated December 12, 2017" and "Co-Debtor" as "Max Warren Barber" individually, and describes the Properties as those "in which the Debtor and Co-Debtor claim some interest" (id. ¶ 1). The Stipulation's operative terms:

a. "Parties agree to discuss in good faith the final payoff amount due prior to July 7, 2025" (id. ¶ 4).

b. "Gravity Capital, LLC agrees that any Trustee's Sale set hereafter will be held after July 7, 2025" (id. ¶ 3).

c. The Addendum provides that "[t]he recorded lien shall be amended to reflect the correct principal and/or balance owed" (id., Addendum ¶ 1).

d. The Addendum conditions the fourteen-day-stay waiver on that performance: the stay "shall be lifted immediately upon the correction of the lien amount" (id., Addendum ¶ 3).

58. The Conditional In Rem Order does not reach a later-filed bankruptcy case. The Stipulation limits its own relief to "any bifurcation or conversion of this case from one chapter to another" (Stipulation ¶ 5), a change within Case No. 25-21749 itself.

59. At the June 2, 2025 hearing, Dove, Barber, and Judge Anderson confirmed on the record that the in rem relief was conditioned on Gravity's Stipulation performance and would terminate if unmet (ECF No. 36-9 at PageID.718-722 (Ex. T)).

60. On June 11, 2025, the court entered the "Order Granting In Rem Relief Pursuant to Stipulation (Docket No. 47)" (ECF No. 66, Ex. 2 at PageID.1135).

61. Barber performed. He stipulated to in rem relief from the automatic stay and co-debtor stay in Gravity's favor and dismissed with prejudice his pending Emergency Motion for Sanctions against Gravity, Knudson, Dove, and Smith Knowles.(Ex. 2, ¶¶ 2, 7; ECF No. 116-2 at PageID.1981).

62. No ledger or accounting has been produced for this loan. No document shows how Barber's payments were received, disbursed, or attributed. The Stipulation required the accounting (¶ 57(a), (c)). Dove's office requested it twice and was told it was forthcoming (¶ 55 items 7-8). It was never produced.

**The Notice of Trustee's Sale (June 16, 2025).**

63. By Notice of Trustee's Sale dated June 16, 2025, Anderson set the sale of both Properties for July 22, 2025 at 9:30 a.m.. The Notice states: "THIS IS AN ATTEMPT TO COLLECT A DEBT, AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE." (ECF No. 88-13 at PageID.1644-1651)

64. The Notice of Trustee's Sale contains its own cancellation trigger for bankruptcy filings: "This Trustee's Sale is subject to a bankruptcy filing, a payoff, a reinstatement or any

other condition of which the Substituted Trustee is not aware that would cause the cancellation of this sale. If any of these conditions exist, this sale will be null and void" (ECF No. 88-13 at PageID.1650).

65. Anderson published the Notice of Trustee's Sale on June 16, one day before the Scrivener's Affidavit that preserved rather than corrected the lien was recorded (¶ 41) and before the lien-amendment precondition to lifting the fourteen-day stay was satisfied (¶ 57(c)-(d)). The Stipulation's accounting requirements remained unperformed at the time (¶¶ 57(a); 55 items 7-8).

**The Automatic Stay (July 8, 2025).**

66. On July 8, 2025, the MSB Trust filed a voluntary petition under Chapter 11, Case No. 25-23863. The automatic stay of 11 U.S.C. § 362(a) arose by operation of law as to the debtor and property of the estate. The DOT names MSB Trust as Trustor (¶ 37) and was never amended or reassigned.

67. Anderson acknowledged the bankruptcy filing in his Statement of Undisputed Material Facts: "On July 8, 2025, Mr. Barber caused a bankruptcy petition to be filed for the MSB Trust (Case No. 2:2025bk23863)" (ECF No. 88 at PageID.1552, SUMF ¶ 23).

**The Insider Bid Coordination (July 15-22, 2025).**

68. On or about July 15-21, 2025, Larry Horton, a known potential bidder, was told the July 22 sale would occur August 15. On July 19, 2025, Horton texted: "Aug 15th is what I was told on both properties. Thursday when I got the call." (ECF No. 35-5 at PageID.277 (Ex. F)). Trapper Roderick, a real estate developer and builder, communicated with Horton on July 19

and confirmed that Horton told him he had received the August 15 date from Gravity Capital LLC / David Knudson (Ex. 7, Roderick Decl. ¶¶ 5-6).

69. Adrian testified that he called Jamis looking for properties and Jamis responded: "Let's see if Dave has any foreclosures" (ECF No. 120, Clip 2 (Session 2 at 01:51:40)). Adrian confirmed that Knudson provided him with the time and place of the sale (ECF No. 120, Clip 3 (Session 2 at 02:00:00); ECF No. 121 at PageID.2000, ¶ 4.C).

70. Jamis admitted he called Knudson regarding the sale: "I called him [Knudson] probably that evening" (ECF No. 120, Clip 5 (Session 3 at 00:08:11)).

**The July 21, 2025 Email Chain.**

71. At 6:06 PM on July 21, 2025, Barber's counsel Adam Ford emailed Anderson, giving written notice that "these properties are covered by the automatic stay," asking about the Stipulation, and stating: "I can't understand why they refuse to provide a pay-off amount and the math behind the pay-off to Max?" (ECF No. 88-22 at PageID.1702 (Ex. P)).

72. At 6:32 PM, Anderson forwarded Ford's email to Knudson (dave@gravitycapllc.com) and Skirvin (steve@thesummitcompanies.com) with "FYI" (ECF No. 88-22 at PageID.1702 (Ex. P))

73. At 6:50 PM, Skirvin responded to Anderson and Knudson, copying Dove and Dove's associate Alexis Martin: "Jared, looping Kenyon in on this to confirm that per the attached order, the automatic stay does not apply to Barber's properties regardless of this new bankruptcy filing. Kenyon, the foreclosure is set for 9:30 am. Please respond ASAP." Skirvin

added: "Barber has been provided multiple payoffs, and he continues to pretend he doesn't have adequate numbers" (ECF No. 88-22 at PageID.1701 (Ex. P)). Through this email, Skirvin gave Dove written notice of the stay and solicited the clearance Dove provided four minutes later.

74. At 6:54 PM, Dove responded to Anderson, Skirvin, and Knudson: "Yes the order for in rem relief protects you from any new bankruptcy filings as to those properties" (ECF No. 88-22 at PageID.1701 (Ex. P)).

75. At the time of this email, Knudson and Gravity had not amended the recorded lien (¶ 41), had not produced the required accounting (¶ 62), and had not performed the Stipulation's conditions (¶ 57).

76. At the time of the July 21 email, Dove, acting as Gravity's bankruptcy counsel at Smith Knowles PC (¶¶ 10-11), knew no accounting had been provided to him by Gravity despite repeated requests (¶ 55 items 7-8). He told Anderson that "the order for in rem relief protects you from any new bankruptcy filings as to those properties" (¶ 74), without disclosing the nonperformance.

77. At 7:01 PM, Skirvin directed Anderson from steve@thesummitcompanies.com: "please proceed with the sale tomorrow... any discussion on numbers should wait until after the sale" (ECF No. 88-22 at PageID.1701 (Ex. P)).

78. Anderson did not respond to Ford, independently verify the stay or confirm the Stipulation's conditions had been performed. He conducted the sale the next morning.

79. On the morning of July 22, before bidding, Barber announced the stay in person at the courthouse (Ex. 8). Six defendants were present: Knudson, Anderson, Jamis Johnson, Adrian

Johnson, Pace Johnson, and Strasnick, confirmed by Pace Johnson's declaration that he and Jamis were both present (ECF No. 114-4 at PageID.1898 ¶ 3).

80. No other member of the public or outside bidder appeared at the sale.

81. Gravity set the opening bid at $650,000, below the claimed debt figures advanced to Dove (¶ 55 items 2-3). Gravity admits: "It set the minimum bid by its credit bid" (ECF No. 71 at PageID.1205).

82. Adrian Johnson was the sole bidder. He bid $650,001, one dollar over the opening bid.

83. Between April 2 and the July 22 sale, a span of 111 days, the total increase from the $622,123.30 baseline (¶ 55 item 1) to the $650,001 winning bid was $27,877.70. Between April 2 and April 28 alone, the claimed debt increased $107,805.96 (¶ 56). The twenty-six-day increase was $79,928.26 larger than the increase over the full 111 days.

84. No surplus was computed or distributed under Utah Code § 57-1-29(1)(a)(iii)(A).

85. Gravity never brought a deficiency action under Utah Code § 57-1-32. The three-month window closed on or about October 22, 2025.

**The Trustee's Deeds (July 23, 2025).**

86. On July 23, 2025, Anderson executed two Trustee's Deeds, each identifying "Anderson Fife Marshall & Johnson LC, Anderson, Jared L" as grantor: Entry No. 14413117 conveying the Yale Property to Adrian Johnson and Stephanie Strasnick as co-grantees, and

Entry No. 14413121 conveying the 1028 Property to 1028 S. 1900 E. LLC. (ECF No. 88-23 at PageID.1704-1708 (Ex. Q))

87. 1028 S. 1900 E. LLC was organized by Pace Johnson on July 22, 2025, the day of the sale. Pace is its sole member, manager, and principal. PJLG is its Registered Agent. (ECF No. 196-4 PageID.3038 (Ex. D)).

88. According to the defendants own statements in the eviction proceeding Pace Johnson, as sole member of 1028 S. 1900 E. LLC, and Adrian Johnson paid a total of $1,450,000 to acquire clean title to both Properties, comprising the Gravity credit bid and full satisfaction of the first-position mortgages on both Properties (ECF No. 156-1 at PageID.2266, Finding 37; ECF No. 88-7 at PageID.1605).

**The Forcible Entry (July 23-24, 2025).**

89. No judicial process was filed for the Yale Property. The eviction action (No. 250906343) addressed the 1028 Property only (¶ 94).

90. Barber was in possession of the Yale Property, family second home with personal property inside (appliances, his tools for the paint work that was in process, kids school work, kids paintings, personal documents, furnishings etc)

91. Neither Jamis Johnson nor Karan Salas is a grantee on either Trustee's Deed (¶ 86).

92. On July 23, 2025, Jamis and Salas entered the Yale Property, rekeyed the doors, and took possession before any writ or judicial process was issued. Salas entered with her husband Jamis (¶15), who had received the notice of stay at the courthouse the day before (¶

79)(ECF No. 35-6 at PageID.281 (Ex. G); Barron Decl., ECF No. 35-4 at PageID.276-281 (Ex. E)). Jamis arrived with a sleeping bag (Barron Decl. ¶ 7).

93. Adrian Johnson and Strasnick, the co-grantees on the Yale Trustee's Deed (¶ 86), continued to occupy the Yale Property without any judicial process or writ.

**The Eviction Action (August 2025-April 2026).**

94. On August 1, 2025, Shorts and Gardner filed an unlawful-detainer action on behalf of 1028 LLC against the 1028 Property only, *1028 S. 1900 E. LLC v. Barber*, No. 250906343 (Utah 3d Dist. Ct.), premised on the Trustee's Deed (¶ 86).

95. The eviction complaint did not disclose the active bankruptcy stay in Case No. 25-23863. On August 28, 2025, Barber filed a Notice of Automatic Stay and Suggestion of Bankruptcy in the eviction, citing the active bankruptcy (No. 25-23863) and moving to dismiss under 11 U.S.C. § 362. Shorts, Gardner, and subsequently D'io continued to prosecute the eviction. (ECF No. 36 at PageID.567 (Ex.K))

96. On September 10, 2025, D'io entered an appearance as Of Counsel at PJLG, joining Shorts and Gardner. (ECF No. 36-4 at PageID.619-620 (Ex. O)).

97. Pace Johnson owns PJLG, (Ex. 9), which serves as 1028 LLC's registered agent and litigation counsel in the eviction action. (ECF No. 196-4 PageID.3038 (Ex. D))

98. Pace declared: "I am the member of 1028 E. 1900 S., LLC [sic]... When I refer to myself, it should also include a reference to the LLC". Pace swore that "my father and his wife who want to be near their grandchildren are moving into the 1028 Home" identifying Jamis as

the intended occupant of the property 1028 LLC acquired (¶ 86) (ECF No. 114-4 at PageID.1898 ¶¶ 2, 4).

99. Jamis Johnson has no recorded interest or role in 1028 LLC (¶ 87), yet he was held out as plaintiff in the eviction and signed the Notice of Substitution as "Plaintiff" on October 29, 2025.

100. Though disbarred (¶ 3), Jamis holds a PJLG email address (jamis@pacejohnson.com) and was included on the firm's litigation correspondence (ECF No. 89-1 at PageID.1722 (Ex. A)).

101. On October 14, 2025, Judge Daynes stated on the record: "Gravity Capital had a stipulation with you, Mr. Barber, that they would do certain things prior to the sale. And apparently, and I didn't hear any refutations, they did not do those things. They didn't file an amended lien of what was owed on the property. ... That's really a breach of contract or a breach of agreement" (ECF No. 121 at PageID.2000).

102. On October 28, 2025, D'io sought to add Adrian Johnson as co-plaintiff, though Adrian holds no interest in 1028 LLC, and filed Adrian's verified petition to quiet title to the separate Yale Property and nullify Barber's lis pendens there (¶ 86). Judge Daynes denied the joinder motion on January 6, 2026.

103. On October 29, 2025, the Court entered an order D'io drafted as Of Counsel at PJLG (¶ 96), with Shorts and Gardner as co-counsel, that expanded Judge Daynes's five oral findings (ECF No. 182-2 at PageID.2856 (Ex. 1)) into forty-one written findings (ECF No. 156-1, at PageID.2255 (Ex. 14)). D'io inserted, among others, a finding that Barber committed "a

federal crime under 18 U.S.C. § 152" and a finding of fraudulent conveyance under 11 U.S.C. § 548. An unlawful-detainer court has no jurisdiction to adjudicate federal crimes (18 U.S.C. § 3231) or bankruptcy avoidance powers (§ 548), and Judge Daynes made neither finding from the bench. Gravity and Anderson have cited the expanded findings against Barber in this action (ECF No. 88-7 at PageID.1603 ¶¶ 26-28; ECF No. 156 at PageID.2250 (citing Exh. 14, p. 2, ¶ 28)).

104. On November 24, 2025, D'io declared he had "no business presence" at 231 East 400 South, Suite 345, Salt Lake City, Utah 84111 (ECF No. 86-1 at PageID.1536, ¶ 8). He had directed correspondence to that address as counsel in the eviction action (ECF No. 36-4 at PageID.619-620 (Ex. O)). Three months later he continued signing filings from the same address (ECF No. 196-3 at PageID.3036 (Ex. C)).

105. Before entering his appearance in the eviction, D'io had been charged with six felony counts involving forged signatures and self-notarized court documents (No. 251401804; ECF No. 196-1 at PageID.3027 (Ex. A); ECF No. 196-2 at PageID.3032 (Ex. B)).

106. On February 20, 2026, Barber filed a renewed motion to vacate and disqualify counsel (ECF No. 182-3 at PageID.2857 (Ex. 2)). No opposition or response was filed. One week later, on February 27, 2026, D'io and PJLG withdrew under URPC 1.16(a)(1), captioning the filing "Mandatory Withdrawal of Counsel and Incurable Conflict of Interest." (ECF No. 196-3 at PageID.3034 (Ex.C)) On April 15, 2026, Judge Daynes dismissed the LLC's remaining claims for failure to prosecute.

107. On April 21, 2026, the "Pace Johnson Law Group" assumed name was cancelled and a successor LLC was organized the same day, designating D'io's entity, DMD LAW, as manager and registered agent (Ex. 9).

## VI.
## SPECIFIC ACTS OF WIRE FRAUD

108. **First Predicate Act.** Between May and September 2024, Barber made five wire payments totaling $110,000 to Gravity Segregation LLC's Zions Bancorp account at 531 East 770 North, Orem: $30,000 on May 6 (ECF No. 36-1 at PageID.597 (Ex. L)); $15,000 on June 4 (ECF No. 36-6 at PageID.663 (Ex. Q)); $20,000 on July 16 (id. at PageID.662); $20,000 on August 15 (id. at PageID.661); and $25,000 on September 20 (id. at PageID.665).

a. On May 6, 2024, Knudson emailed Skirvin and Barber from dave@gravitycapllc.com to steve@thesummitcompanies.com: "extend ... for 1 month as per the 30K that he wired us" (ECF No. 36-1 at PageID.595 (Ex. L)). Skirvin reset the sale date (id. at PageID.599).

b. Knudson texted Barber: "Let this serve as notice that the foreclosure will be cancelled" (ECF No. 36-6 at PageID.662 (Ex. Q)). Knudson: "I have not cancelled the sell yet" (id. at PageID.663).

c. Knudson texted: "Are u getting this months payment in? 20 k I think. ASAP before sale" (ECF No. 36-6 at PageID.661 (Ex. Q)).

d. After Barber invoked the agreed cancellation "after the third payment," Knudson texted: "Need payment by the 23rd" (ECF No. 36-6 at PageID.668 (Ex. Q)).

Each communication was a wire transmission in furtherance of a scheme to induce payments untethered to any stated balance through false promises while withholding the accounting that would have revealed the actual obligation (¶ 54).

109. **Second Predicate Act.** On June 17, 2025, Knudson as President of Gravity Capital LLC recorded the Scrivener's Affidavit (¶ 41) through interstate e-recording vendor Deeds.com, Inc. of Fairlawn, Ohio (Salt Lake County Entry No. 14398969, Book 11579, Pages 5965-66; ECF No. 71-10 at PageID.1328 (Ex. 8)).The Affidavit acknowledged the only principal draw was $332,000 but preserved the $2,400,000 encumbrance as correct rather than correcting it (¶ 41). The e-recording was in furtherance of a scheme to preserve the inflated lien (¶¶ 37-38) while creating the appearance of compliance with the Stipulation (¶ 55).

110. **Third Predicate Act.** On June 17, 2025, Gravity recorded the Conditional In Rem Order through the same vendor, Deeds.com, Inc., as Entry No. 14398970 (ECF No. 66, Ex. 2 at PageID.1135). The recorded order grants relief "Pursuant to the Stipulation" but omits the Stipulation and its Addendum containing the unperformed conditions (¶¶ 57-62). The e-recording was in furtherance of a scheme to create the public-record appearance that the sale was unconditionally authorized.

## VII.
## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

111. To the extent any claim is measured from the March 2022 loan origination, the limitations period is tolled by fraudulent concealment. The lender-drafted loan documents contained a business-purpose label three times (¶ 42), including a stated purpose of "constructing

and selling wellhead equipment," a business Barber has never operated (¶ 42). The label eliminated the consumer-lending disclosures that would have revealed the TILA and HOEPA violations now alleged (¶¶ 43-48). The label suppressed the disclosures; the suppressed disclosures concealed the violations. Knudson did not disclose the 1999 Order and injunction, which prohibits this practice (¶ 49, § III.C).

112. Barber exercised due diligence. He demanded the accounting beginning August 2024 (¶ 54), secured Stipulation terms requiring it (¶ 57(a), (c)-(d)), performed his own obligations (¶ 61), and followed up through June 2025 (¶ 55 items 7-8). Gravity's own counsel requested it twice and was told it was forthcoming (¶ 55 items 7-8). Skirvin directed that numbers wait until after the sale (¶ 77). No accounting has been produced (¶ 62).

113. The state-law claims are independently tolled by equitable estoppel, which operates separately from the fraudulent-concealment tolling pleaded at ¶¶ 111-112.[3] The defendants covenanted in the Stipulation to correct the lien and provide the accounting (¶ 57), confirmed those conditions at the hearing (¶ 59), then directed that numbers wait until after the sale (¶ 77). Barber consented to in rem relief on the basis of those covenants (¶ 61) and continued seeking the promised accounting (¶ 55 items 5-8).

114. Barber accepted the business-purpose label at face value. He did not know Knudson was subject to the 1999 Order (¶ 49); his signature on the lender-drafted recital is not independent knowledge of the violations that recital concealed (¶¶ 42, 50(a), (c), (f)). The

[3] *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232-33 (1959) ("no man may take advantage of his own wrong"; principle "deeply rooted in our jurisprudence" bars inequitable reliance on limitations periods).

concealment persisted until the irreconcilable debt figures in 2025 (¶¶ 55-57) exposed a predatory structure no consumer-lending disclosure had ever revealed. In the alternative, the TILA and HOEPA claims are preserved by recoupment under 15 U.S.C. § 1640(e); the foreclosure sale was "an attempt to collect a debt" (¶ 63).

## VIII.
## SCOPE OF THE EVICTION

115. The unlawful-detainer action, *1028 S. 1900 E. LLC v. Barber,* No. 250906343 (Utah 3d Dist. Ct.), was a summary possessory proceeding that addressed possession of the 1028 Property only.[4] No other defendant in this action was a party and none of the claims asserted here was pleaded, litigated, or decided there. The voidness of the sale under 11 U.S.C. § 362 is a federal question within this Court's jurisdiction (28 U.S.C. § 1334(b)). The UD court's oral findings (ECF No. 182-2 at PageID.2856) were made without discovery and enterprise evidence documenting the four-decade Knudson-Johnson relationship (¶¶ 135-144). Judge Daynes acknowledged on the record that Gravity "did not do those things" the Stipulation required (¶ 101), yet the possession judgment was entered on the Trustee's Deed (¶ 86). If the deed is void (Count I), the statutory prerequisite for the UD action was never satisfied.[5]

## IX.
## CAUSATION AND DAMAGES

[4] *Osguthorpe Family P'ship v. Wolf Mountain Resorts, LC*, 2010 UT 29, ¶ 24, 232 P.3d 999 (unlawful detainer is a summary proceeding for possession and is "not the appropriate vehicle for litigating disputes over non-possessory interests in property" ); *see also Bichler v. DEI Systems, Inc.*, 2009 UT 63, ¶ 29, 220 P.3d 1203 ("One of the primary purposes of the unlawful detainer statute is to provide a speedy resolution on the issue of possession").

[5] *Sovereen v. Meadows*, 595 P.2d 852, 853 (Utah 1979) (unlawful detainer "provides a severe remedy" that "must be strictly complied with before the cause of action may be maintained"; if the statutory prerequisite is not met, "the lessee was not in unlawful detainer and the lessor was not entitled to maintain the unlawful detainer action").

116. The recorded lien (¶¶ 37-39) prevented refinancing. The claimed debt figures were irreconcilable (¶¶ 55-57) and no accounting was produced (¶ 62). The Conditional In Rem Order was obtained while the Stipulation's covenants went unperformed (¶¶ 57-62). The suppressed accounting and unamended lien prevented Barber from curing, refinancing, or closing the pending $2,900,000 sale (¶ 119). The sale at $650,001 fixed the loss (¶¶ 81-82).

117. The principal measure of damages is net equity destroyed by the void sale. The computation appears at ¶ 124.

118. Months before the sale, the 1028 Property appraised at $1,600,000 (March 12, 2025) and the Yale Property at $1,300,000 (April 10, 2025), for a combined $2,900,000 (Ex. 10). These values match the contracted sale prices (Ex. 11).

119. Plaintiff had contracted to sell both Properties for $2,900,000 (Ex. 11). Cottonwood's Settlement Statement reflected the April 2 lien-release quote of $622,123.30 (Ex. 12; ¶ 55 item 1). The transaction could not close in time because no verifiable accounting was provided from which to confirm actual obligation (¶ 62) and the recorded liens remained unamended (¶¶ 37-38, 41). The buyer's principal independently confirms the sale failed due to the lienholder's refusal to correct the encumbrances (Ex. 7, Roderick Decl. ¶ 12).

120. Senior first-position liens held by Canyon View Federal Credit Union[6] originated residential mortgage loans to Barber individually, secured by both Properties: 1028 Property, Entry 11734824, recorded October 1, 2013 in the amount of $416,000; Yale Property, Entry 12866841, recorded October 12, 2018, in the amount of $453,100. Combined recorded amount

[6] Successor by merger to University First Federal Credit Union

of $869,100. As of June 10, 2025, the outstanding balance was $741,360.82 ($333,796.46 on 1028; $407,564.36 on Yale) (Ex. 13). Gravity's DOT, recorded March 23, 2022 is junior to each (¶ 37).

121. **Total recorded encumbrances.** The Salt Lake County Recorder showed $1,200,000 in Gravity liens per parcel (¶ 37), a combined $2,400,000, plus $869,100, in Canyon View senior liens (¶ 120), for total recorded encumbrances of $3,269,100 against properties valued at $2,900,000 (¶ 118).

122. **Lien inflation.** The difference between the $2,400,000 recorded encumbrance and the $332,000 actually advanced is $2,068,000. That excess was never the debt. Gravity's own lien-release quote of $622,123.30, a fraction of the recorded amount (¶ 55 item 1). The Scrivener's Affidavit left the $1,200,000-per-parcel lien uncorrected (¶ 41).

123. The only principal actually advanced was $332,000 (¶¶ 36, 40-41). Barber's wire records show $110,000 in payments between May and September 2024 (¶ 108). Skirvin's April 28 claimed debt figure credits $130,663.63 in payments received (¶ 55 item 2), $20,663.63 more than Barber's documented wires, indicating total payments beyond those wires to Gravity of not less than $200,000. No accounting has been produced to show how any payment was applied (¶ 62).

124. **Equity-destruction measure.** The contracted sale price for both Properties was $2,900,000.00 (¶ 119) plus Barber's unaccounted payments to Gravity of not less than $200,000.00 (¶ 123), less Canyon View senior liens of $741,360.82 (¶ 120), less defendants' sworn principal of $332,000.00 (¶ 40). Net equity stripped: $2,026,639.18.

125. **Per-property damages.** The 1028 Property had an appraised value of $1,600,000 (¶ 118), encumbered by a Canyon View senior lien of $333,796.46 (¶ 120). The Yale Property had an appraised value of $1,300,000 (¶ 118), encumbered by a Canyon View senior lien of $407,564.36 (¶ 120). Each property's equity strip is included in the combined computation at ¶ 124.

126. **Cascade damages (pleaded in the alternative).** The July 22 sale and resulting title cloud prevented the pending $2.9 million sale (Ex. 11) and rendered the Canyon View mortgage obligations unserviceable. The Johnson defendants subsequently satisfied the Canyon View senior liens  consolidating clean title to both Properties for a total insider outlay of $1,450,000 (¶ 88) against a combined appraised value of $2,900,000 (¶ 118). Barber pleads this consequential loss in the alternative to, not in addition to, the equity-destruction measure.

## X.
## THE GRAVITY LENDING ENTERPRISE
### The Association-in-Fact Enterprise

127. The Gravity Lending Enterprise is an association-in-fact within 18 U.S.C. § 1961(4): a continuing organization that originates loans to "the non-bankable" (¶ 53) with "no credit criteria,"(¶ 52) based on asset value alone (¶¶ 52-53), documented as "business purpose" (¶¶ 42-43, 52). Knudson has stated the enterprise has "geared our scenario to people who don't make their payments on time" with a "rollover fee built into the documents" (¶ 53), and has completed "hundreds and hundreds of these loan transactions"(¶ 53) in all fifty states (¶ 52). The

lending model replicates the practices the 1999 Order prohibits (¶¶ 49-50). The predicate acts that produced Barber's injury were transmitted through Gravity's infrastructure (¶¶ 108-110).[7]

128. Knudson controls and operates the enterprise through Gravity Capital, Gravity Segregation (¶¶ 2,19), and the Summit-Lillywhite entity network (¶¶ 146-156). The lending model is the enterprise's regular way of doing business (¶ 169).

129. In Barber's transaction, the lender-drafted documents labeled the Loan "business purpose" (¶¶ 42-43), eliminating TILA disclosures, HOEPA protections (¶¶ 43- 48), and the borrower's right to rescind (¶ 50(f)). The Loan carried a 15% base rate, a 24% default rate compounding monthly, a 92-day balloon, and 10% late charges (¶ 36). The label was false: the consumer- purpose evidence ¶ 42(a)-(g) contradicts it in every particular. The label eliminated the regulatory framework that would have prohibited the predatory terms the 1999 Order enjoins (¶ 50(d)-(g)). The lender defines its primary purpose as financing to "individuals"(¶ 53).

130. The lien is the extraction mechanism. The DOT recorded an encumbrance on each Property at $1,200,000 on a $332,000 advance unsupported by the unattached note (¶¶ 37-40). Knudson’s lien release quote of $622,123.30 on April 2, 2025 confirms the recorded amount bore no relationship to the actual obligation (¶ 55 item 1). Twenty-six days later, Skirvin claimed debt of $729,929.26, including "an extra $10k built into legal" (¶ 55 item 2). No accounting accompanied either figure (¶ 62). The Stipulation required a good-faith accounting and lien amendment (¶ 57 (a),(c)); Gravity performed neither (¶ 41, 62). Gravity's counsel stated he was

---

[7] *Boyle v. United States*, 556 U.S. 938, 944-46 (2009) (an association-in-fact enterprise requires only a purpose, relationships among associates, and longevity sufficient to pursue the enterprise's purpose; no hierarchy, fixed roles, or formal structure required).

"concerned about recording an amended deed of trust affecting the priority of my client's lien" (¶ 55 item 6). The uncorrected lien deterred outside bidders (¶¶ 120-122).

131. The Johnsons participated through their four-decade relationship with Knudson (¶¶ 135-144). Jamis Johnson directed Adrian Johnson to Knudson(¶¶ 69-70), and Adrian was the sole bidder (¶ 82). Pace Johnson organized 1028 LLC the day of the sale for Jamis (¶¶ 87, 97-98).

132. Knudson set the credit bid at $650,000 (¶ 81), below the $729,929.26 claimed debt and below the $733,000 Stipulation figure (¶ 55 items 2-3). He diverted the one known outside bidder with a false sale date (¶ 68) and provided the sale details only to Adrian, whose family's relationship with Knudson spans decades (¶¶ 69-70, 135-144). No outsider bidder appeared and Adrian was the sole bidder at one dollar over (¶¶ 80-82). No deficiency action was brought and there was no surplus (¶¶ 84-85). Under Utah Code § 57-1-29, a surplus requires the trustee to account for and distribute excess proceeds; no surplus means no accounting. No creditor owed $729,929.26 would set its own credit bid $79,929.26 below that figure, then forgo the deficiency, unless the claimed debt exceeded the actual obligation.

133. The Johnsons built the legal infrastructure to ratify the acquisition. Shorts and Gardner filed the eviction without disclosing the active stay (¶¶ 94-95). D'io entered an appearance as Of Counsel at PJLG (¶ 96). Pace Johnson controlled both the plaintiff entity and the firm through which D'io appeared (¶¶ 87, 97). D'io drafted the expanded order inserting findings beyond the court's jurisdiction and its oral ruling, including a federal crime and fraudulent conveyance (¶ 103). Through PJLG, Pace sought quiet title to the separate Yale

Property in a proceeding that addressed only the 1028 Property (¶ 102). The infrastructure performed as designed: it produced findings calculated to undermine Barber's claims to both properties, which defendants have since cited against him in this action.(¶ 103)

134. Every person who exercised legal authority on the buyer's side is an attorney or former attorney: Pace Johnson, D'io, Shorts, and Gardner are licensed (¶¶ 5, 12-14); Jamis Johnson practiced law before his disbarment (¶ 3). The recorded In Rem Order states on its face that it operates "Pursuant to the Stipulation" (¶ 60). Judge Daynes stated on the record that Gravity had not performed the Stipulation's conditions (¶ 101). The Johnsons treated the In Rem Order as unconditional authority for their title, disregarding the Stipulation's unperformed conditions on which that authority depended (¶¶ 57(c)-(d), 41, 62). The four-decade Knudson-Johnson relationship (¶¶ 135-144) and the acquisition of two Harvard-Yale homes appraised at $2,900,000 (¶ 118) for $650,001 at an auction where Adrian was the sole bidder (¶¶ 80-82) removed any concern with the conditional nature of the authority on which their title depended.

135. Knudson and the Johnsons held real estate through insider nominees for decades. Johnson never held record title to his own residence at 1408 Military Way, Salt Lake City (Ex. 14), because recorded judgments and tax liens would attach to any property in his name (Ex. 15).

136. Bruce Giffen, Danell Johnson, and Knudson co-incorporated Fort Corporation in 1994 (ECF No. 157-11); David Knudson, Holly Knudson, and Mark Cummings organized DMD LLC in 1996 (Ex. 16).

137. Between June 1998 and August 1999, the property cycled among these insiders for nominal $10 consideration: Giffen to Danell Johnson (Entry 7001928, June 19, 1998), Danell to Cummings (Entry 7065435, Aug. 21, 1998), Cummings to Knudson (Entry 7127594, Oct. 22, 1998).

138. On October 22, 1998, Knudson took title to the property (Entry 7127594). The same day, he executed a quitclaim deed returning it to Danell Johnson but did not record it. Six days later, on October 28, he recorded a trust deed encumbering the property in favor of KeyBank for $202,201 (Entry 7133810). He recorded the quitclaim to Danell Johnson nearly ten months later, on August 10, 1999 (Entry 7439546; Ex. 17) after the FTC filed the Complaint (July 28, 1999) and before Knudson signed the Stipulated Final Judgment (August 23, 1999)(¶ 49). Danell Johnson conveyed the property the same day to D.M. Johnson & Associates LLC (Entry 7439547).

139. In 2017, Pace Johnson formed 1408 Holdings LLC (Ex. 18), sued Juan Evereste LLC and John Sanchez (No. 170901141, Third District Court), and three days after filing took the property by two $10 deeds recorded the same day (Entries 12483912, 12483913). Weeks later, Pace signed and filed the application to reinstate Juan Evereste LLC, the same entity he was simultaneously suing (Ex. 19).Upon information and belief, Sanchez is the same individual who served as President of the Everett-James Company, co-incorporated by Knudson and Johnson in 1993 (Ex. 20)

140. **Corporate co-directorships (1988-1996).** Between 1988 and 1996, Knudson and Johnson served as co-directors and co-officers in seven entities sharing the same registered

address at 160 E 300 S, Salt Lake City (ECF No. 157-2 through 157-9). Two of those entities also included Johnson's future criminal co-defendants: A. Paul Schwenke, later convicted with Johnson of securities fraud (ECF No. 157-2), and R.W. Haycock, later convicted with Johnson of federal mortgage fraud (ECF No. 157-8, 157-9). At that address, Johnson also operated Utah Foreclosure Service, Inc. (ECF No. 157-10). Knudson and Danell Johnson co-directed Fort Corporation at the same address (ECF No. 157-11).

141. **The Wasatch entities (1989-1997).** Between 1989 and 1997, Johnson executed recorded instruments as trustee for entities controlled by Holly Knudson and David Knudson. The entities: Knute III, LLC, managed by Holly Knudson with Wasatch Credit I, LLC as member and David Knudson as Registered Agent (ECF No. 157-12, 157-13); and Wasatch Equities Corporation, Holly Knudson as president, David Knudson as Registered Agent (ECF No. 157-14, 157-15). Holly Knudson, David Knudson, and Wasatch Credit Corporation were permanently enjoined in 1999 (¶ 49).

142. **Johnson's trustee acts for the Wasatch entities.** Johnson served as trustee on notices of default for Holly Knudson and Knute III (ECF No. 157-16, 157-17, 157-20); deeds of reconveyance for Holly Knudson and Wasatch Equities (ECF No. 157-18, 157-24); a trustee's deed conveying property to Knute III (ECF No. 157-19); a trust deed for Wasatch Equities (ECF No. 157-23); and a scrivener's affidavit for Wasatch Credit Corp. referencing five additional instruments he prepared for the same entity (ECF No. 157-22).

143. **Litigation history (1989-2000).** Johnson served as attorney of record for Knudson's d/b/a Utah Agrisource LLC in a lien and mortgage foreclosure action (ECF No.

157-30) and was a co-defendant with Knudson in a property-rights action (ECF No. 157-26). In two actions, Johnson, Knudson, and Holly Knudson were co-defendants alongside Wasatch Credit Corporation (ECF No. 157-25, 157-27), the entity the 1999 Order permanently enjoined (¶ 49). A borrower filed a lis pendens naming Johnson and Knute III after Johnson foreclosed and conveyed the property to Knute III (ECF No. 157-21, 157-19). Johnson and Knudson were also co-defendants in two additional actions (ECF No. 157-28, 157-31).

144. **Prior convictions and disbarment.** A licensed attorney before his disbarment (¶ 3), Johnson understood the legal mechanics of trust deeds, nominee structures, and foreclosure proceedings. He was convicted on twenty-seven counts of mail fraud, wire fraud, conspiracy, and money laundering, *United States v. Johnson,* No. 2:09-cr-00133-CW (D. Utah), aff'd, 821 F.3d 1194 (10th Cir. 2016), and of state securities fraud, *State v. Johnson,* 2009 UT App 382. These convictions demonstrate knowledge of wire fraud and money-laundering mechanics and the absence of mistake.

145. The defendants identified at ¶¶ 158-168 are the persons associated with the enterprise whose participation is set forth below; the Gravity Lending association-in-fact is the ongoing organization, distinct from each of them, through which they act. The enterprise is not synonymous with any single member; Gravity Segregation LLC is a constituent of the enterprise, not the enterprise itself. Its structure, relationships, and methods predate and extend beyond the conduct alleged in this action: Knudson and the Johnsons held and moved property through non-party nominees for decades (¶¶ 135-139), their shared corporate directorships, trustee roles, and litigation span 1988 to 2000 (¶¶ 140-143), and Gravity's current operations are conducted

through a layered entity structure spanning the Summit, Weighting Agent, and Lillywhite networks (¶¶ 146-156)

**Entity Structure and Control**

146. David Lillywhite managed Gravity Segregation through Summit Operating, LLC. Summit Operating was organized to “finance the acquisition and operation of real property and personal property.” David Lillywhite signed the Articles as “Registered Agent, Managing member” of Summit Energy LLC, Summit Operating’s manager at formation. (Ex. 21). From 2011 Summit Operating held both manager positions at Gravity Segregation LLC. (Ex. 22). Lillywhite was added as a governing person of Summit Operating LLC (Ex. 23).

147. David Lillywhite is also the President and Director of Summit Energy Management Corporation (Ex. 24), the entity that serves as the Manager and Registered Agent of Weighting Agent Management, LLC (Ex. 25). Weighting Agent Management was formed for “Managing other companies and enterprises.” (id). Lillywhite was added as a governing person of Weighting Agent Management (Ex. 26). On April 28, 2025, Skirvin changed Gravity Segregation’s Registered Agent to Weighting Agent Management LLC (Ex. 27).

148. Summit Capital, LLC was formed in 2018 (Ex. 28) with Weighting Agent Management as both its Manager and Registered Agent. Skirvin swore his representation of Summit Capital was “not relevant to this matter” (ECF No. 103-2 ¶ 3 at PageID.1802). Knudson declared “There is no contractual relationship between any Gravity Defendant and Summit Capital LLC” (ECF No. 103-1 ¶ 5 at PageID. 1799).

149. On December 22, 2025, Knudson removed Summit Operating as Manager of both Gravity entities and installed himself as sole Governing Person (Exs. 29). The inflated claimed debt and the directive to proceed with the sale were transmitted from the "thesummitcompanies.com" five months earlier (¶¶ 55 item 2, 77).

150. On August 18, 2023, Skirvin signed the Substitution of Trustee as Gravity's Vice President (ECF No. 88-9 at PageID.1630-1632 (Ex. C)). Knudson swore Skirvin's in-house counsel role ran from approximately July 1, 2022 to July 15, 2025 (ECF No. 103-1 at PageID.1798 ¶ 4), and that Skirvin "is not an 'operational' person" who "performs the same functions as outside counsel" (id.)

151. Between October 14 and December 12, 2025, Skirvin signed annual reports for four Summit-network entities as "Authorized Person": Summit Capital Management LLC on October 14 (Ex. 30), Summit Energy Ventures LLC and Summit Operating LLC on October 28 (Exs. 31, 32), and Summit Capital LLC on December 12 (Ex. 33) after he swore his Summit representation was "not relevant" (¶ 148). He had also signed Gravity Segregation's registered-agent change as "Authorized Signor" on April 28, 2025 (¶ 147).

152. Four SEC Form D filings (CIK 1719902, October-December 2017) identify David Lillywhite as Director of Gravity Segregation LLC and Knudson as Director/Executive (Ex. 34). The four filings raised $1,285,864 in debt securities classified under "Other Real Estate" in sixty days.

153. A recorded $400,000 trust deed from Summit Energy Ventures LLC to David Knudson (Utah County Entry No. 190380:2020; Ex. 35), notarized by Joshua David Lillywhite, documents capital flow from the Summit tier to the enterprise's lending principal.

154. A warranty deed recorded October 23, 2018 shows Gravity Segregation LLC conveying real property to Matrix Porosity LLC for $10.00, signed by David Lillywhite for Gravity Segregation and notarized by Joshua David Lillywhite (Ex. 36).

155. Joshua Lillywhite is Gravity Capital's Senior Loan Officer, responsible for "generating and evaluating investment opportunities" and able to "quickly assess the collateral value of any given property and put together the basic framework for a deal" (Ex. 37). As early as 2018, he was the contact person for Gravity Segregation, LLC on a trustee's sale notice filed in the Central District of California (Ex. 38), four years before Barber's Loan. On information and belief, that function extended to Gravity's lending portfolio during the relevant period, including the Loan.

156. Gravity Segregation (Ex. 27, 36), Summit Operating (Ex. 23), Summit Capital (Ex. 28), Summit Energy Management Corporation (Ex. 24), Summit Energy Ventures (Ex. 31), Weighting Agent Management (Ex. 25), and Matrix Porosity (Ex. 36) all maintained their principal address at 531 East 770 North, Orem, Utah before and during the period of Barber's Loan and the foreclosure.

157. Gravity entities are used interchangeably. In a federal criminal forfeiture proceeding, Gravity's own attorney filed a Section 853(n) petition on behalf of Gravity Funding LLC, the wrong entity, when the actual lender was Gravity Capital LLC, which had made a

$360,000 loan to the criminal defendant. The attorney stated he worked on another Gravity Funding matter and used a similar pleading. *United States v. Tiras, No. 23-20475, at 4 (5th Cir. May 16, 2025)*. The Fifth Circuit affirmed denial of the petition, holding the drafting error fatal to Gravity's claim.

**Each Defendant's Participation**

158. **Gravity and David Lee Knudson:** Originated the Loan in violation of the 1999 Order, including its prohibitions on false business-purpose labels, misrepresentation of credit terms, collateral-only lending, dwelling-secured high-cost credit without required disclosures, and extending consumer credit without the required performance bond (¶¶ 36, 49-50).Recorded the inflated lien and preserved the $2,400,000 encumbrance by Scrivener's Affidavit rather than correcting it (¶¶ 37-38, 41). Did not produce the accounting Barber requested beginning August 2024 (¶ 54), collecting $110,000 in payments during that period without providing a balance from which to derive them (¶ 108). Did not produce the accounting the Stipulation required beginning May 2025 (¶ 57(a), (c)) and that Dove's own office requested repeatedly through July 2025 (¶ 55 items 7-8). No accounting has been produced (¶ 62). Diverted competing bidder Horton with a false sale date (¶ 68) and provided Adrian alone with the time and place of the sale, whose family's relationship with Knudson spans four decades (¶¶ 69-70, 135-144). Set the opening bid at $650,000, below every claimed debt figure (¶¶ 55 items 2-3, 81), then forewent any deficiency action (¶ 85). Committed predicate acts one through three (¶¶ 108-110).

159. **Jamis Johnson:** Directed Adrian to Knudson before the sale (¶¶ 69-70). Forcibly entered the Yale Property the next day without any judicial process or writ (¶ 92). Not a grantee on either deed and has no recorded role in 1028 LLC (¶¶ 91, 99). Maintained a PJLG email address and was included on the firm's litigation correspondence while disbarred (¶ 100). Signed as "Plaintiff" in the eviction (¶ 99).

160. **Adrian Isaac Johnson:** Directed to Knudson by Jamis (¶ 69). Sole bidder (¶ 82). Took title to the Yale Property; the 1028 Property was deeded to 1028 LLC (¶ 86). Sought quiet title to the separate Yale property through an eviction action that addressed only the 1028 Property (¶ 102). Continued to occupy Yale without judicial process or writ (¶ 93).

161. **Steven R. Skirvin:** Signed the Substitution of Trustee as Gravity's Vice President, installing the trustee who conducted the sale (¶ 150). Transmitted that inflated debt to Dove (¶ 55 item 2), padding $10,000 for anticipated legal fees and increasing the claimed debt $107,805.96 in twenty-six days (¶ 56) without a verifiable accounting (¶ 62), on the same day he changed Gravity's registered agent to Weighting Agent Management, a Summit-network entity (¶147). Directed Anderson to proceed with the sale before the Stipulation's conditions were performed (¶¶ 57, 62, 77) ensuring the sale occurred before the inflated claimed debt could be verified or challenged. Signed annual reports for entities across the Summit and Gravity network as "Authorized Person" (¶ 151) after swearing his Summit representation was not relevant (¶148), while transmitting both the inflated debt and the sale directive from thesummitcompanies.com (¶¶ 55 item 2, 77). Committed predicate act one (¶ 108).

162. **Jared Anderson:** Published the Notice of Sale before the Stipulation's conditions were met (¶ 65). His firm billed Gravity Capital $14,381.10 for the "MSB Trust Foreclosure," with billing entries spanning 2023-2024, including researching "how a bankruptcy affects collecting on a promissory note," coordinating an opening bid, and communicating with potential buyers (ECF No. 36-13 at PageID.832-836 (Ex. CC)). Forwarded Ford's stay notice and concern regarding Gravity's unwillingness to provide a payoff or accounting to Knudson and Skirvin (¶ 72). Received the payoff-suppression directive and did not respond to Ford or verify the stay (¶¶ 77, 78). Executed both Trustee's Deeds (¶ 86).

163. **Pace William Johnson:** Sole member of 1028 LLC, organized the day of the sale, and owner of PJLG (¶¶ 87, 97). Declared himself and the LLC interchangeable, and identified Jamis Johnson as the intended occupant of the 1028 Property (¶ 98).

164. **Pace Johnson Law Group LLC:** Served as registered agent for 1028 LLC (¶ 87) and entered the eviction action as litigation co-counsel when D'io appeared as Of Counsel at PJLG (¶ 96), in an action filed on the void Trustee's Deed without disclosing the active bankruptcy stay (¶¶ 94-95). Through PJLG, Pace Johnson sought to join Adrian as co-plaintiff and obtain quiet title to the separate Yale Property (¶ 102). PJLG's Of Counsel, who had been charged with felony forgery of court documents (¶ 105) drafted the expanded order inserting findings beyond the court's jurisdiction and beyond its oral ruling, including a federal crime and a fraudulent conveyance (¶ 103). Extended a firm email to Jamis Johnson while disbarred (¶ 100).

165. **Kenyon D. Dove and Smith Knowles PC:** Dove, acting through Smith Knowles PC (¶¶ 10-11), proposed that Barber stipulate to in rem relief with the promise of resolving the total amount owed afterward (¶ 55 item 5). Dove drafted the Stipulation with covenants requiring Gravity to correct the lien and provide the accounting (¶ 57) and Barber signed on that basis (¶ 61). After Barber signed, Dove expressed concern that correcting the lien would 'affect[] the priority of my client's lien' (¶ 55 item 6). Dove confirmed the Stipulation's conditions at the June 2 hearing (¶ 59).In the two months between Dove's May 21 promise to resolve the accounting (¶ 55 item 5) and his July 21 clearance of the sale, his office requested the accounting from Gravity repeatedly and never received it (¶ 55 items 6-8; ¶ 62). By June 13, Dove knew Gravity was recording a Scrivener's Affidavit rather than amending the lien as the Stipulation required (¶ 55 item 8). On July 21, Dove cleared the sale after receiving the stay notice (¶ 74), knowing the Stipulation's conditions remained unperformed (¶ 76).

166. **Summit Operating LLC:** Managed Gravity Segregation as Manager #1 and Manager #2 (¶ 146). Summit Operating was organized to "finance the acquisition and operation of real property" and "to incur indebtedness, secured or unsecured, for any of the purposes of the Company" (Ex. 21, § 7(b)-(c)). The inflated claimed debt (¶ 55 item 2) and the directive to suppress the accounting and proceed with the sale (¶ 77) were both transmitted from the Summit network's email domain.

167. **David Albert Lillywhite:** Managed Gravity through Summit Operating (¶¶ 146, 149) and served as Gravity's registered agent through Weighting Agent Management (¶¶ 146-147). The entity he managed defines its purpose as "to provide private financing to

individuals and possibly to companies" (¶ 53; Ex. 22). Lillywhite managed the entity that originated the Barber Loan (¶¶ 36, 129) under the lending model the 1999 Order prohibits (¶¶ 49-53). SEC filings identify him as a Director of Gravity Segregation itself (¶ 152).

168. **Joshua David Lillywhite:** Gravity's Senior Loan Officer (¶ 155), executing the Gravity Lending model (¶¶ 52-53) the 1999 Order prohibits (¶ 50(a)-(c), (e)). Notarized enterprise transactions including a $400,000 trust deed from Summit Energy Ventures to Knudson and a $10 property conveyance from Gravity to Matrix Porosity (¶¶ 153-154). Designated contact for Gravity on a California foreclosure (¶ 155). On information and belief, his function extended to the Loan. On information and belief, his function extended to the Loan.

### Continuity

169. **Open-ended continuity.**[8] The Gravity Lending model (¶¶ 52-53), the same practices the 1999 Order prohibits (¶ 49), is the enterprise's regular way of doing business. Barber's Loan followed this model (¶¶ 36-43), and the predicate acts arose from it.

170. **Closed-ended continuity (alternative).** The related acts span March 22, 2022 to July 24, 2025; the chargeable wire-fraud predicates span May 2024 through July 2025 (¶¶ 108-110).

## XI.
## CLAIMS FOR RELIEF

[8] *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241-43 (1989) ("Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition"; threat of continuity established where "the predicates are a regular way of conducting defendant's ongoing legitimate business").

The counts are pleaded in the alternative under Rule 8(d)(2) and seek redress for a single indivisible economic injury. Barber seeks no double recovery. Barber incorporates and realleges paragraphs 1 through 170 into each Count below as if fully set forth herein.

## COUNT I

### 11 U.S.C. § 362(a) THE JULY 22, 2025 SALE IS VOID AB INITIO

(Against David Lee Knudson, Gravity Segregation LLC, Steven R. Skirvin, Jared L. Anderson, Anderson, Fife, Marshall & Johnson, LC, Jamis Johnson, Adrian Isaac Johnson, 1028 S. 1900 E. LLC, Stacy Roberts Johnson, and Stephanie Strasnick)

171. The automatic stay arose on July 8, 2025 (¶ 66). Defendants received actual notice (¶¶ 67, 72-74, 79); 1028 S. 1900 E. LLC through Pace Johnson (¶¶ 79, 98); Stacy Roberts Johnson through her spouse Pace Johnson (¶¶ 16, 79). The sale (¶ 81) and recording of the Trustee's Deeds (¶ 86) violated 11 U.S.C. § 362(a)(3)-(5).

172. The Conditional In Rem Order (¶ 60) does not satisfy § 362(b)(20). The Stipulation limited its relief to Case No. 25-21749 (¶ 58). The Addendum conditioned the fourteen-day stay waiver on correction of the lien (¶ 57(d)). The lien was never corrected (¶ 41). The waiver was therefore never triggered, and the in rem relief did not authorize the July 22, 2025 sale.

173. The sale and deeds are void ab initio.[9] Barber is entitled to a declaration under 28 U.S.C. § 2201 and restoration of title and possession.

---

[9] *Ellis v. Consolidated Diesel Elec. Corp.*, 894 F.2d 371, 372-73 (10th Cir. 1990) (actions taken in violation of the automatic stay are “void and without effect").

## COUNT II

### BREACH OF THE COURT-APPROVED STIPULATION

(Against Gravity Segregation LLC and David Lee Knudson)

174. The Stipulation is a binding contract, approved by the bankruptcy court (¶¶ 57-61). Barber performed (¶ 61). Gravity breached: the lien was not corrected (¶ 41), no accounting was produced (¶ 55 items 6-8; ¶ 62), the fourteen-day stay waiver was never triggered because the lien-correction precondition was never satisfied (¶ 57(d)), Anderson published the Notice of Sale before the precondition was performed (¶ 65), and Skirvin directed that numbers wait until after the sale (¶ 77). The eviction court corroborated the breach (¶ 101).

175. If the In Rem Order did not reach the later case, the stay barred the sale (Count I); if it did, Gravity's breach of its conditions defeats it.

176. Barber is entitled to damages (¶¶ 116-125).

## COUNT III

### 11 U.S.C. § 362(k) WILLFUL STAY VIOLATION DAMAGES

(Against David Lee Knudson, Gravity Segregation LLC, Steven R. Skirvin, Jared L. Anderson, Anderson, Fife, Marshall & Johnson, LC, Kenyon D. Dove, Smith Knowles PC, Jamis Johnson, Adrian Isaac Johnson, Pace William Johnson, and Stephanie Strasnick, Dastan D’io, Jeremy Shorts, David Gardner, Pace Johnson Law Group)

177. The stay violation is established at Count I (¶¶ 171-173). The Properties are property of the estate (¶¶ 31, 66), and the prosecution of the eviction on the void Trustee's Deed

constituted a continuing act to obtain possession of estate property in violation of § 362(a)(3) (¶¶ 94-95). The forcible entry and occupation of the Yale Property the day after the sale constituted a separate violation (¶¶ 89-93). Each defendant intended the acts that violated the stay.[10]

178. Each defendant had actual notice: Anderson by Ford's email (¶ 71); Knudson, Skirvin, and Dove through the July 21, 2025 email chain (¶¶ 72-74); The Johnsons by Barber's courthouse announcement (¶ 79); D'io, Shorts, and Gardner through Barber's Notice of Automatic stay filed in the eviction (¶ 95) and D'io's drafted findings citing 18 U.S.C. § 152 and 11 U.S.C. § 548 (¶ 103), to which Shorts and Gardner were co-counsel; Pace Johnson Law Group LLC through Pace Johnson's presence at the courthouse and its role as registered agent and litigation counsel in the eviction (¶¶ 79, 97).

179. Barber is an individual injured by the violation (¶¶ 28-32). The Stipulation identifies Barber as Co-Debtor with "some interest" in the Properties. Gravity obtained conditional relief from the co-debtor stay as Barber individually (¶¶ 60-61). He is entitled to actual damages (¶¶ 116-126), costs, attorneys' fees, and, in appropriate circumstances, punitive damages under 11 U.S.C. § 362(k).

## COUNT IV

### 18 U.S.C. § 1962(c) RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

(Against David Lee Knudson and Steven R. Skirvin)

---

[10] *In re Johnson*, 501 F.3d 1163, 1172-73 (10th Cir. 2007) (a willful violation requires that "the creditor knew of the automatic stay and intended the actions that constituted the violation; no specific intent is required";"beliefs, however reasonable, have no bearing on willfulness")

180. The Gravity Lending Enterprise is an association-in-fact (¶¶ 127-170). The enterprise's lending model (¶ 129) and foreclosure method (¶ 130) were conducted through three wire-fraud predicates (¶¶ 108-110). The insider acquisition that followed (¶¶ 132-134) was made possible by those predicates. Each defendant is associated with the enterprise and participated, directly or indirectly, in the conduct of its affairs through those predicates.[11] The pattern satisfies both open-ended and closed-ended continuity (¶¶ 169-170). The enterprise is engaged in interstate commerce: Gravity lends in all fifty states (¶ 52).

181. Knudson originated the Loan in violation of the 1999 Order (¶¶ 2, 49-50), including recording the inflated lien (¶¶ 37-38), withheld the accounting the Stipulation required (¶ 62), and set the opening bid at $650,000 below every claimed debt figure (¶¶ 55 items 2-3, 81). Skirvin directed Anderson to suppress the accounting and proceed with the sale when the Stipulation's conditions remained unperformed (¶¶ 41, 57, 62, 77). Each act was a direct cause of the equity loss at ¶ 124; no intervening act of any non-RICO defendant produced that injury independently. As a direct and proximate result, Barber was injured in his business or property (¶¶ 116-125). Barber is entitled to treble damages under 18 U.S.C. § 1964(c).

182. Alternative: Utah Pattern of Unlawful Activity Act**.** In the alternative, the same enterprise, pattern, and predicate allegations support a claim under Utah Code § 76-17-401 et

[11] *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1252-54 (10th Cir. 2016) (lower-rung participants who knowingly carry out management's decisions conduct the enterprise's affairs under *Reves v. Ernst & Young*, 507 U.S. 170, 179, 184 (1993), even when acting under the direction of upper management).

seq.[12] A person injured by conduct forbidden by § 76-17-407 may recover twice the damages sustained. Utah Code § 76-17-403(1)(a).

## COUNT V

### 18 U.S.C. § 1962(d) RICO CONSPIRACY

(Against David Lee Knudson, Gravity Segregation LLC, Jamis Johnson, Adrian Isaac Johnson, Steven R. Skirvin, Jared L. Anderson, Kenyon D. Dove, Smith Knowles PC, Pace William Johnson, Pace Johnson Law Group LLC, Summit Operating LLC, David Albert Lillywhite, and Joshua David Lillywhite)

183. Barber incorporates Count IV (¶¶ 180-182) and the enterprise allegations at ¶¶ 127-170. Knudson and the Johnsons have operated through shared entities, nominee structures, and recorded instruments since 1988 (¶¶135-144). Knudson and Gravity originated the Loan in violation of the 1999 Order (¶¶ 49-50), withheld the accounting, set the credit bid below every claimed debt figure, and committed all three predicate acts (¶¶ 158, 108-110). David Lillywhite managed the enterprise through Summit Operating under the lending model the 1999 Order prohibits (¶¶ 146-156, 167). Joshua Lillywhite originated lending opportunities as Gravity's Senior Loan Officer, notarized enterprise transactions between the Summit and Gravity tiers (¶ 166) , executing that model (¶ 168). Skirvin held operational roles across both the Gravity and Summit networks while representing them as litigation counsel (¶¶ 148-151, 161). Dove drafted the Stipulation binding Gravity to conditions his own client never performed, then cleared the

[12] Recodified from § 76-10-1601 et seq., effective May 7, 2025.

sale without disclosing the nonperformance (¶ 165). Anderson followed the suppression directive and executed both deeds (¶ 162). The Johnsons coordinated with

Knudson before the sale and acquired both Properties through an insider bid no outside bidder attended (¶¶ 131-134, 159-160). Pace organized 1028 LLC the day of the sale and built the eviction infrastructure through PJLG (¶¶163-164). Each defendant's role in the enterprise and agreement to facilitate its affairs is set forth at ¶¶ 131-168. *Salinas v. United States*, 522 U.S. 52, 63-65 (1997).

184. The conspiracy injured Barber through the predicate acts alleged at ¶¶ 108-110 and for the reasons alleged in Count IV (¶¶ 180-182). Barber is entitled to treble damages under 18 U.S.C. § 1964(c).

## COUNT VI

### 15 U.S.C. § 1 BID SUPPRESSION AT THE JULY 22, 2025 FORECLOSURE AUCTION

(Against David Lee Knudson, Gravity Segregation LLC, Jamis Johnson, Adrian Isaac Johnson, Stephanie Strasnick, Pace William Johnson, and 1028 S. 1900 E. LLC)

185. The defendants suppressed competitive bidding at the July 22, 2025 foreclosure sale through two coordinated mechanisms. First, Knudson and Gravity maintained the uncorrected $2,400,000 lien on a $332,000 advance (¶¶ 37-41). As early as April 2, 2025, Knudson offered to release the lien for $622,123.30 (¶ 55 item 1), confirming the recorded amount did not represent the debt. The Stipulation required a lien amendment (¶ 57(c)-(d)). After Barber signed, Dove expressed concern that amending the lien would "affect[] the priority of my client's lien" (¶ 55 item 6). The lien was never corrected (¶ 41). Combined with Canyon View's

$869,100 in senior liens, total recorded encumbrances of $3,269,100 against properties valued at $2,900,000 created the public-record appearance of negative equity that deterred outside bidders (¶¶ 120-122). Second, Knudson diverted the one known outside bidder with a false sale date while outside bidders were excluded, Knudson provided Adrian Johnson alone with the time and place of the sale (¶¶ 68-70). Skirvin directed that numbers wait until after the sale (¶ 77). No outsider appeared and Adrian was the sole bidder at one dollar over the credit bid Knudson set below his own claimed debt figures (¶¶ 80-83). Bid rigging at foreclosure auctions is a per se violation of 15 U.S.C. § 1.[13] In the alternative, the same facts establish a restraint unreasonable under the rule of reason.

186. Barber was injured by the rigged auction (¶¶ 81-83).[14] Barber is entitled to treble damages under 15 U.S.C. § 15 computed at ¶ 124

**COUNT VII**

**15 U.S.C. §§ 1631(a), 1639g TRUTH IN LENDING ACT VIOLATIONS**

(Against Gravity Segregation LLC and David Lee Knudson)

---

[13] *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) ("a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se"); *United States v. Joyce*, 895 F.3d 673, 677-78 (9th Cir. 2018) (bid rigging at public foreclosure auctions is per se illegal under Section 1). *see also United States v. Reicher,* 983 F.2d 168, 170-72 (10th Cir. 1992) (per se violation "depends on whether there was an agreement to subvert the competition, not on whether each party to the scam could perform").

[14] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful").

187. No TILA disclosures were given at origination, including the rate spread, the origination fees, and the prepayment penalty (¶¶ 43-46). Gravity is the creditor (¶ 19). Knudson directed the origination (¶¶ 2, 36). The credit was consumer credit (¶ 42(a)-(g)); the consumer-purpose facts and the business-purpose labels are pleaded in the alternative. The lender's own Articles of Organization define its purpose as financing to "individuals"(¶ 53). The business-purpose label eliminated Barber's right to rescind the dwelling-secured transaction (¶ 43; ¶ 50(f)). The 1999 Order enjoins each of these practices by name (¶¶ 49, 51). Gravity regularly extends this category of credit (¶¶ 52-53). Knudson's individual liability is pleaded in the alternative.

188. Barber made repeated written requests for a payoff statement and accounting requests between August 2024 and June 2025 (¶ 54; ¶ 55 items 7-8) and stipulated to in rem relief to secure that obligation (¶¶ 57(a), 61). Neither was provided (¶ 62)

189. Barber pleads these violations both affirmatively and, in the alternative, by recoupment under 15 U.S.C. § 1640(e).[15] Barber is entitled to statutory damages, recoupment of all finance charges and fees paid, and the relief provided under 15 U.S.C. §§ 1639g, 1640(a), and 1640(e).[16]

## COUNT VIII

[15] *Beach v. Ocwen Federal Bank*, 523 U.S. 410, 417-18 (1998) (distinguishing § 1640(e) damages recoupment, which survives the limitations period, from § 1635(f) rescission, which "shall expire" after three years).

[16] *In re Beach*, 447 B.R. 313, 320-22 (Bankr. D. Idaho 2011) (nonjudicial foreclosure is "an action to collect [a] debt" under § 1640(e); TILA violations may be raised defensively by recoupment).

**15 U.S.C. § 1639 HOEPA VIOLATIONS**

(Against Gravity Segregation LLC and David Lee Knudson)

190. The Loan exceeded both statutory triggers for a "high-cost mortgage" under 15 U.S.C. § 1602(bb)(1)(A). The rate spread exceeded the subordinate lien threshold by 3.17 points (¶¶ 44, 120). The origination fees exceeded the 5% threshold (¶ 45). The Loan contains terms HOEPA prohibits: a 92-day balloon and a 24% default rate compounding monthly (¶ 36), a prepayment penalty in substance (¶ 46), and collateral-only lending without regard to ability to repay (¶ 52). The bridge-loan exemption does not apply (¶ 47).

191. Gravity and Knudson furnished none of the high-cost disclosures HOEPA requires and obtained no performance bond (¶ 48). Gravity is the creditor (¶ 19); Knudson's individual liability is pleaded as set forth at Count VII (¶ 187).

192. Barber is entitled to the enhanced HOEPA remedy under 15 U.S.C. § 1640(a), including a refund of all finance charges and fees paid, statutory damages, and costs, asserted both affirmatively and, in the alternative, by recoupment.

**COUNT IX**

**15 U.S.C. §§ 1692a(6), 1692f(6), 1692k FAIR DEBT COLLECTION PRACTICES ACT**

(Against Jared L. Anderson and Anderson, Fife, Marshall & Johnson, LC)

193. Anderson and his firm are in the business of enforcing security interests (¶¶ 7, 63, 162). Under *Obduskey v. McCarthy & Holthus LLP,* 586 U.S. 466, 472-73 (2019), an entity

whose principal purpose is the enforcement of security interests is a "debt collector" for purposes of 15 U.S.C. § 1692f(6).

194. Section 1692f(6) prohibits a debt collector from "[t]aking or threatening to take any nonjudicial action to effect dispossession or disablement of property if .. there is no present right to possession of the property claimed as collateral through an enforceable security interest." Anderson had no present right to possession when he conducted the July 22, 2025 sale and executed both Trustee's Deeds (¶ 86):

a. The automatic stay of 11 U.S.C. § 362(a) was in effect as of July 8, 2025 (¶ 66), stripping Anderson's authority to exercise the power of sale. Anderson received actual written notice of the stay through Ford's July 21, 2025 email (¶ 71).

b. The Conditional In Rem Order was entered "pursuant to the stipulation" (¶ 60). The Stipulation's Addendum conditioned the fourteen-day stay waiver on correction of the recorded lien (¶ 57(d)). The lien was never corrected (¶ 41). The waiver was therefore never triggered, and the in rem relief did not restore Anderson's right to sell.

c. Anderson published the Notice of Trustee's Sale before the Stipulation's lien-amendment precondition was satisfied (¶ 65). Ford's email raised the automatic stay and Gravity’s refusal to provide a payoff or accounting (¶ 71). Anderson forwarded that email to Knudson and Skirvin without responding to Ford (¶ 72) and followed Skirvin’s directive to suppress the accounting and proceed with the sale, without independently verifying the stay or the Stipulation’s conditions had been performed (¶¶ 77-78) conduct exceeding the good-faith

steps required by state law that *Obduskey* contemplated. 586 U.S. at 478-80 ("enforcing a security interest does not grant an actor blanket immunity from the Act").

195. Barber is entitled to damages under 15 U.S.C. § 1692k.

## COUNT X

### Utah Code § 57-1-25(5) BREACH OF TRUSTEE'S STATUTORY DUTIES

(Against Jared L. Anderson and Anderson, Fife, Marshall & Johnson, LC)

196. Anderson is a qualified trustee (¶ 7) who exercised the power of sale. Under §57-1-25(5), a trustee "has a duty to the trustor not to defraud, or conspire or scheme to defraud, the trustor." Anderson breached that duty as follows:

a. He published the Notice of Trustee's Sale before the Stipulation's lien-amendment precondition was satisfied and before the Scrivener's Affidavit was recorded (¶ 65).

b. He received Ford's written notice of the stay and inquiry about the withheld accounting (¶ 71), forwarded it to Knudson and Skirvin without responding to Ford (¶ 72), and followed Skirvin's directive to suppress the accounting and proceeded (¶¶ 77-78).

c. He conducted the sale without independent verification of any kind (¶ 78) and executed both Trustee's Deeds (¶ 86).

d. The sale violated the automatic stay and is void (Count I). The trustee had no power to sell.

197. Anderson's breach of the duty imposed by Utah Code § 57-1-25(5) independently renders the sale voidable. Barber is entitled to avoidance of the sale, restoration of title, and compensatory damages.

## COUNT XI

### COMMON-LAW FRAUD AND FRAUDULENT INDUCEMENT

(Against Gravity Segregation LLC, David Lee Knudson, Steven R. Skirvin, Kenyon D. Dove, and Smith Knowles PC)

198. Under Utah common law (*Gold Standard, Inc. v. Getty Oil Co.,* 915 P.2d 1060, 1067 (Utah 1996); *Cerritos Trucking Co. v. Utah Venture* No. 1, 645 P.2d 608, 611 (Utah 1982)), Defendants committed actionable fraud and fraudulent inducement through the following particulars:

a. Barber refused to stipulate without first understanding the accounting discrepancy (¶ 55 item 4). Dove proposed stipulating immediately and resolving the amount later (¶ 55 item 5), then drafted the Stipulation binding Gravity to amend the liens and produce the accounting (¶ 57). Barber signed on the basis of those promises (¶ 61). Dove confirmed the conditions on the record at the June 2 hearing (¶ 59).

b. The promise accompanied by an intention not to perform, was false and material when made: On May 21, hours after Barber signed, Dove expressed concern that amending the lien would "affect[] the priority of my client's lien"(¶ 55 item 6). By May 29, Dove still had nothing from his own client (¶ 55 item 7). The court entered the Stipulation on June 11 (¶ 60). By June 13, two days after the order, Dove was still asking Gravity for the accounting (¶

55 item 8; ¶ 76). No accounting was produced (¶ 62). The lien was not corrected (¶ 41). Skirvin directed that numbers wait until after the sale (¶ 77).

c. Barber reasonably relied on these false representations and covenants, agreeing to the in rem relief to secure the accounting and lien correction he needed to close the pending $2,900,000 sale (¶¶ 61, 119)

d. Each defendant acted with scienter, knowing the promises were false when made  or acting with reckless disregard for their truth:

**Knudson** signed the Scrivener's Affidavit preserving the inflated lien rather than correcting it (¶ 41), a separate affirmative misrepresentation recorded against both Properties.

**Skirvin** directed that "any discussion on numbers should wait until after the sale" (¶ 77) after Dove's own office had repeatedly requested the accounting from Gravity and never received it (¶ 55 items 7-8; ¶ 76) ensuring no party could verify the claimed debt before the sale was consummated.

**Dove and Smith Knowles PC** cleared the sale after receiving the stay notice (¶ 74), despite knowing that the preconditions his office wrote into the Stipulation remained unperformed (¶ 76).

199. As a direct and proximate result of Defendants' fraud, Barber suffered severe economic injury. Had the required accounting and lien correction been furnished as promised, Barber could have closed the pending $2,900,000 sale (¶ 119) and retained the substantial equity destroyed by the void foreclosure sale (¶¶ 116–126).

## COUNT XII

**SLANDER OF TITLE**

(Against Gravity Segregation LLC and David Lee Knudson)

200. Gravity and Knudson published a false statement affecting Barber's title: the DOT was recorded against both properties at $1,200,000 each, unsupported by the Note that was never attached (¶¶ 37-40). The recorded amount is false: Knudson swore the actual advance was $332,000 (¶ 40); the excess is $2,068,000 (¶ 122). Knudson's lien-release quote of $622,123.30, which it stated "includes all interest, fees, and legal expenses incurred to date" (¶ 55 item 1), confirms the $1,200,000 per-parcel recording bore no relationship to the actual obligation. The Scrivener's Affidavit preserved the encumbrance rather than correcting it (¶ 41), constituting a second publication of the false amount. The inflation was maintained with malice: Gravity's counsel expressed concern that amendment would "affect[] the priority of my client's lien" (¶ 55 item 6), at the same time the Stipulation required it (¶ 57(c)-(d)).[17] The inflated lien clouded title to both Properties and directly harmed Barber, who is individually liable on the underlying loan as guarantor and obligor (¶¶ 28(b)-(c)), is identified in the Stipulation as Co-Debtor with "some interest" in the Properties (¶ 57), signed the Stipulation "as Trustee and Individually" (¶ 29), and was prevented from closing his contracted $2,900,000 sale (¶ 119).

201. Barber suffered special damages: the pending $2,900,000 sale failed because no verifiable accounting was provided and the recorded liens remained unamended (¶ 119). Barber

[17] *First Sec. Bank v. Banberry Crossing*, 780 P.2d 1253, 1257 (Utah 1989) (malice may be implied where a party knowingly and wrongfully records something untrue); *Bass v. Planned Mgmt. Servs., Inc.*, 761 P.2d 566, 568 (Utah 1988); *Lavender v. FCOI Preserve, LLC*, 2025 UT App 47.

is entitled to compensatory damages, punitive damages, and removal of the instruments from title.

## COUNT XIII

### UNJUST ENRICHMENT AND QUIET TITLE

(Against Jamis Johnson, Adrian Isaac Johnson, Stephanie Strasnick,
Pace William Johnson, 1028 S. 1900 E. LLC, and Stacy Roberts Johnson)

202. The sale is void (Count I) and no downstream transferee is a bona fide purchaser. Barber announced the stay at the courthouse (¶ 79). No outsider appeared (¶ 80). Adrian was the sole bidder (¶ 82). The Properties were conveyed to Adrian and Strasnick (Yale) and to 1028 LLC (1028 Property) (¶ 86), whose sole member Pace Johnson declared himself and the LLC interchangeable (¶ 98). [18] Defendants acquired Properties valued at $2,900,000 (¶ 118) for a total insider outlay of $1,450,000 (¶ 88), through a void sale retaining Barber's equity as his expense.

203. Barber is entitled to restitution, a constructive trust on both Properties and their proceeds, and quiet title.

## COUNT XIV

### INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS

(Against Gravity Segregation LLC, David Lee Knudson, Steven R. Skirvin,
Kenyon D. Dove, and Smith Knowles PC)

---

[18] *See Rawlings v. Rawlings*, 2010 UT 52, ¶ 29, 240 P.3d 754 (constructive trust arises "where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it").

204. Each defendant independently interfered with Barber's pending $2,900,000 sale through tortious and unlawful conduct.[19] Barber had contracted to sell both Properties (¶ 119). Knudson signed a lien-release quote to Cottonwood Title for the pending sale (¶ 55 item 1). Dove proposed the Stipulation to "give you time to sell the property" (¶ 55 item 5), expressed concern about correcting the lien because it would affect "the priority of my client's lien" (¶ 55 item 6), and cleared the sale on July 21 despite knowing no accounting had been provided to him by Gravity (¶ 76). The interference consisted of:

a. recording the inflated lien and refusing to correct it (¶¶ 37-38, 41);
b. not producing the accounting or correcting the lien the Stipulation required (¶¶ 57(a), (c), 62)) and directing that numbers wait until after the sale (¶ 77); and
c. conducting the sale during the automatic stay (¶¶ 66, 79).

205. The pending sale failed because no verifiable accounting was provided and the recorded liens remained unamended (¶ 119). Barber is entitled to compensatory and punitive damages.

## COUNT XV

### ABUSE OF PROCESS

(Against 1028 S. 1900 E. LLC, Pace William Johnson, Pace Johnson Law Group LLC, Jamis Johnson, Dastan M. D'io, Jeremy Shorts, and David Gardner)

206. The eviction action was filed on a void Trustee's Deed (¶ 94; Count I) without disclosing the active bankruptcy stay (¶ 95) and was used for purposes beyond a summary

[19] *Eldridge v. Johndrow*, 2015 UT 21, ¶¶ 13-14, 345 P.3d 553; *C.R. England v. Swift Transp. Co.*, 2019 UT 8, ¶¶ 42, 48, 437 P.3d 343 (improper means is conduct "contrary to law, such as violations of statutes, regulations, or recognized common-law rules").

possessory action.[20] Defendants had already forcibly entered and maintained possession of the Yale Property without any judicial process (¶¶ 89-92). Judge Daynes acknowledged the underlying stipulation breach on the record (¶ 101). Two acts exceeded the proper scope of a summary possessory action: the joinder and quiet-title maneuver on the separate Yale Property (¶ 102), and the expanded order inserting findings beyond the court's jurisdiction and beyond its oral ruling, including a federal crime and a fraudulent conveyance (¶ 103). No opposition was filed to Barber's renewed motion to vacate and disqualify, and the LLC's remaining claims were dismissed for failure to prosecute (¶ 106).

207. Barber is entitled to compensatory damages for the loss of possession of the 1028 Property and the litigation prejudice caused by the expanded findings cited against him in this action (¶ 103), and punitive damages.

## COUNT XVI

### TRESPASS, CONVERSION, AND SECOND STAY VIOLATION

(Against Jamis Johnson, Adrian Isaac Johnson, Stephanie Strasnick, and Karan Salas)

208. Defendants forcibly entered the Yale Property without any judicial process, exercised dominion over Barber's personal property, and excluded Barber by rekeying the doors (¶¶ 89-92). Defendants had knowledge that the automatic stay was in effect (¶ 79).

209. The Yale Property was estate property on July 23, 2025 (¶¶ 37, 66).

[20] *Hatch v. Davis*, 2006 UT 44, ¶¶ 33-39, 147 P.3d 383.

210. The rekeying is a second § 362(a) violation, one day after the July 22 sale, independent of and subsequent to that sale. Barber seeks actual and punitive damages.

## XII.
## PRAYER FOR RELIEF

WHEREFORE, Barber respectfully requests that the Court enter judgment in his favor and against the defendants, jointly and severally as appropriate, granting the following relief:

a. A declaration that the July 22, 2025 sale and both Trustee's Deeds recorded July 23, 2025 (Entry 14413117 as to the Yale Property and Entry 14413121 as to the 1028 Property; ¶ 86) are void ab initio, and of no force or effect as against the defendants named in Count I and anyone claiming by, through, or under them arising from that sale or those deeds. An order avoiding the sale and quieting title in Barber to both the 1028 Property (Parcel 16-09-427-010) and the Yale Property (Parcel 16-09-429-005), with equal force as to each, and expunging the void Trustee's Deeds and the downstream conveyance to 1028 S. 1900 E. LLC, including as against anyone claiming by, through, or under those deeds or conveyances.

b. Compensatory damages for breach of the court-approved Stipulation (Count II). A full equitable accounting of the debt, payments, credits, the basis of the recorded lien, and the disposition of the sale proceeds. The accounts are of such a complicated nature that only equitable relief can satisfactorily unravel them; the defendants deployed the inconsistent debt figures at ¶ 55 without producing the unified accounting the Stipulation required (¶¶ 55, 61).

c. Actual damages, costs, punitive damages under 11 U.S.C. § 362(k) for the willful

stay violation (Count III).

d. Treble damages under 18 U.S.C. § 1964(c) ("shall recover threefold the damages he sustains"), in the amount of three times the net equity strip computed in ¶¶ 116-126 ($6,079,917.54); and, in the alternative, double damages under the Utah Pattern of Unlawful Activity Act, Utah Code § 76-17-403(1)(a) ("recover twice the damages that the person sustains") ($4,053,278.36) (Counts IV-V).

e. Treble damages under 15 U.S.C. § 15 for the Sherman Act bid-rigging conspiracy, together with costs of suit as Section 15 provides (Count VI).

f. Statutory and actual damages under the Truth in Lending Act, 15 U.S.C. § 1640 (Count VII).

g. A declaration that the 2022 Promissory Note, Business Loan Agreement, Loan Guaranty, and Deed of Trust (Entry No. 13917256) are void and unenforceable under HOEPA and as products of fraud and illegality, with reconveyance and expungement from the title of both Properties, and HOEPA statutory damages under 15 U.S.C. § 1640(a)(4) for violations of the prohibited high-cost terms of 15 U.S.C. § 1639 (Count VIII).

h. Statutory and actual damages and costs under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692k (Count IX).

i. Avoidance of the sale and restoration of title under Utah Code § 57-1-25(5), independent of the federal stay, and compensatory damages (Count X).

j. Compensatory and punitive damages for fraud (Count XI).

k. A declaration that the recorded $2,400,000 Deed of Trust is void as to the amount

exceeding the actual obligation as determined by accounting, and removal of the inflated instrument from the title of both Properties and compensatory and punitive damages (Count XII).

l. Restitution and disgorgement of the netted equity strip computed in ¶¶ 116-126 and the imposition of a constructive trust on the Properties and their proceeds, rents, and profits (Count XIII).

m. Compensatory and punitive damages for intentional interference with economic relations, abuse of process, and trespass, conversion, and second stay violation (Counts XIV-XVI).

n. A preliminary and permanent injunction prohibiting defendants and their agents from further transferring, encumbering, or dissipating the Properties or their proceeds during the pendency of this action.

o. Pre- and post-judgment interest, costs, and such other and further relief as the Court deems just.

## XIII.
## DEMAND FOR JURY TRIAL

Barber demands a trial by jury on all issues so triable, under Fed. R. Civ. P. 38(b).

DATED on 29th day of July, 2026 Salt Lake County

Respectfully submitted,

/s/ Max Warren Barber
Max Warren Barber

**EXHIBIT LIST**

| **Ex.** | **Description** |
|---|---|
| Ex. 1 | Gravity Capital DBA certificate (July 2022) |
| Ex. 2 | Court-approved Stipulation for In Rem Relief |
| Ex. 3 | Barber-Parrish pre-closing emails (Mar. 2022) |
| Ex. 4 | Gravity Capital FAQ page |
| Ex. 5 | Dove-Barber correspondence re Stipulation conditions, accounting requests, and lien correction (May-July 2025) |
| Ex. 6 | Gravity lien-release quote, $622,123.30 (Apr. 2, 2025) |
| Ex. 7 | Roderick Declaration with Attachments A-B (July 16, 2026) |
| Ex. 8 | Barber courthouse photographs (July 22, 2025) |
| Ex. 9 | PJLG cancellation and successor LLC filing (Apr. 2026) |
| Ex. 10 | Thompson appraisals, both Properties ($2,900,000 combined) |
| Ex. 11 | Real estate purchase contracts, $2.9M pending sale |
| Ex. 12 | Cottonwood Title settlement statement (Apr. 2025) |
| Ex. 13 | Canyon View FCU proofs of claim and Deeds of Trust on both Properties |
| Ex. 14 | SL County Recorder printout, 1408 Military Way |
| Ex. 15 | Jamis Johnson judgments and tax liens, 1408 parcel |
| Ex. 16 | DMD LLC articles of organization (Jan. 1996) |
| Ex. 17 | Knudson-to-Danell Johnson quitclaim deed, 1408 (Oct. 1998) |
| Ex. 18 | 1408 Holdings LLC formation record (Feb. 2017) |
| Ex. 19 | Juan Evereste LLC reinstatement, signed Pace Johnson (Apr. 2017) |
| Ex. 20 | Everett-James Company articles (Dec. 1993) |

| **Ex.** | **Description** |
|---|---|
| Ex. 21 | Summit Operating LLC articles of organization (Lillywhite as Managing Member of Summit Energy, LLC) (Nov. 2002) |
| Ex. 22 | Gravity Segregation LLC articles of organization (Summit Operating as Manager #1 and #2) (Sept. 2011) |
| Ex. 23 | Summit Operating LLC summary of changes, Lillywhite as Governing Persons (Nov. 2018) |
| Ex. 24 | Summit Energy Management Corporation summary of changes, Lillywhite as President and Director (Aug. 2016) |
| Ex. 25 | Weighting Agent Management LLC certificate of organization (purpose: "Managing other companies and enterprises") (Sept. 2016) |
| Ex. 26 | Weighting Agent Management LLC summary of changes, Lillywhite as Governing Persons (Oct. 2018) |
| Ex. 27 | Gravity Segregation registered-agent change to Weighting Agent Management, signed Skirvin as "Authorized Signor" (Apr. 28, 2025) |
| Ex. 28 | Summit Capital LLC certificate of organization (Jan. 2018) |
| Ex. 29 | Gravity Segregation amendment removing Summit Operating, Knudson as sole Governing Person (Dec. 22, 2025) |
| Ex. 30 | Summit Capital Management LLC annual report, signed Skirvin as "Authorized Person" (Oct. 14, 2025) |
| Ex. 31 | Summit Energy Ventures LLC annual report, signed Skirvin as "Authorized Person" (Oct. 28, 2025) |
| Ex. 32 | Summit Operating LLC annual report, signed Skirvin as "Authorized Person" (Oct. 28, 2025) |
| Ex. 33 | Summit Capital LLC annual report, signed Skirvin as "Authorized Person" (Dec. 12, 2025) |
| Ex. 34 | SEC Form D filings, Gravity Segregation (CIK 1719902, 2017) |
| Ex. 35 | Trust deed, Summit Energy Ventures to Knudson, $400,000 (2020) |

| Ex. | Description |
|---|---|
| Ex. 36 | Gravity-to-Matrix Porosity warranty deed, $10, signed Lillywhite/notarized J. Lillywhite (Oct. 2018) |
| Ex. 37 | Gravity Capital website, J. Lillywhite Senior Loan Officer |
| Ex. 38 | California trustee's sale notice, J. Lillywhite as Gravity contact (2018) |